1    HARMEET K. DHILLON (SBN: 207873)
2    harmeet@dhillonlaw.com
    RONALD D. COLEMAN (*pro hac vice* pending)
3    rcoleman@dhillonlaw.com
    KARIN M. SWEIGART (SBN: 247462)
4    ksweigart@dhillonlaw.com
5    DHILLON LAW GROUP INC.
    177 Post Street, Suite 700
6    San Francisco, California 94108
7    Telephone: (415) 433-1700
    Facsimile: (415) 520-6593
8

9    MARK E. TRAMMELL (*pro hac vice* pending)
10    mtrammell@libertycenter.org
    CENTER FOR AMERICAN LIBERTY
11    5100 Buckeystown Pike, Suite 250
12    Frederick, MD 21704
    Telephone: (703) 687-6212
13    Facsimile: (517) 465-9683
14

15    Attorneys for Plaintiff ROGAN O'HANDLEY

16

17          **UNITED STATES DISTRICT COURT**

18          **CENTRAL DISTRICT OF CALIFORNIA**

19

20

21    ROGAN O'HANDLEY,

22           Plaintiff,

23            v.

24

25    ALEX PADILLA, in his personal capacity;
    SKDKNICKERBOCKER, LLC, a Delaware
26    company; PAULA VALLE CASTAÑON, in
    her personal capacity; JENNA DRESNER, in
27    her personal capacity; SAM MAHOOD, in
28    his personal capacity; AKILAH JONES; in
    her personal capacity; SHIRLEY N.
28    WEBER, in her official capacity as

| Case Number: |
| --- |
| COMPLAINT FOR DECLARATORY JUDGMENT, DAMAGES, AND INJUNCTIVE RELIEF |
| **DEMAND FOR JURY TRIAL** |

1



California Secretary of State; TWITTER, INC., a Delaware corporation; NATIONAL ASSOCIATION OF SECRETARIES OF STATE, a professional nonprofit organization;

Defendants.

Plaintiff Rogan O'Handley, through his undersigned counsel, states the following claims for relief against Alex Padilla, in his personal capacity; SKDKnickerbocker, LLC, a Delaware corporation; Paula Valle Castañon, in her personal capacity; Jenna Dresner, in her personal capacity; Sam Mahood, in his personal capacity; Akilah Jones; in her personal capacity; Shirley N. Weber, in her official capacity as California Secretary of State; Twitter, Inc., a Delaware corporation; and the National Association of Secretaries of State, a professional nonprofit organization.

## INTRODUCTION

1.     Against a backdrop of alleged foreign interference in the 2016 election, various state election agencies, state election officials, national organizations, and social media companies mounted campaigns to combat election misinformation concerns on social media for the 2020 election. While many of these entities pursued a traditional path of educating the public with useful information, others went in a new direction, seeking aggressively to suppress speech they deemed to be "misleading," under the guise of fostering "election integrity." The State of California generally, and the Secretary of State's Office of Elections Cybersecurity in partnership with the other Defendants specifically, took the latter path.

//

Complaint                                                              Case No.

2.     California's initial foray into the brave new world of engineering better election outcomes, California Elections Code §10.5, created the Office of Elections Cybersecurity in 2018 to "educate voters" with "valid information" through empowering election officials (hereinafter "OEC"). This seemingly benign mandate quickly and predictably devolved into a political weapon for censorship of disfavored speech by an overtly partisan Secretary of State's office, more resembling an Orwellian "Ministry of Approved Information" than a constitutionally restrained state agency. The OEC deployed government force to bolster the personal political goals of Democrat office holders, most notably including then-Secretary of State Alex Padilla ("Padilla"). Padilla abused his office and the public trust in a myriad of ways, unprecedented even in a California where political corruption has become part of the landscape, as predictable as the sun setting over the Pacific Ocean.

3.     Plaintiff Rogan O'Handley ("Mr. O'Handley) was just one of many speakers targeted in California's tainted censorship process. Mr. O'Handley's speech infraction was his expression of the opinion that California, along with the rest of the nation, should audit its elections to protect against voter fraud. A Democratic political consultant—hired with taxpayer dollars in a closed-bid, closed-door boondoggle to which not even California's Democrat Controller could turn a blind eye—flagged Mr. O'Handley's inconvenient speech to the OEC as evidence of "election misinformation." The OEC, an office within the primary agency whose job performance would be scrutinized by an audit, then contacted Twitter through dedicated channels Defendants created to streamline censorship requests from government agencies. Twitter promptly complied with the OEC's request to censor Mr. O'Handley's problematic opinions from its platform, and ultimately banned his account, which had reached over 440,000 followers at its zenith, for violating Twitter's civic integrity policy.

4.     The founding fathers fought and died for the right to criticize their government, and enshrined that foundational right as central in the pursuit of the new

Complaint                                                                                      Case No.

nation. Defendants' exercise of government force to censor political speech with which they disagree flies in the face of the ideals upon which our nation was founded, and violates numerous state and federal constitutional rights.

## JURISDICTION

5.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 because Plaintiff's claims arise under the First and Fourteenth Amendments to the U.S. Constitution. Further, the Court has jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff seeks relief under 42 U.S.C. § 1983.

6.      This action is an actual controversy, and under 28 U.S.C. §§ 2201 and 2202, this Court has authority to grant declaratory relief, and other relief, including temporary, preliminary, and permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and may declare the rights of Plaintiff.

7.      This Court has supplemental jurisdiction over state law claims presented in this matter pursuant to 28 U.S.C. § 1367, because the claims are so related to the federal constitutional claims in this action such that they do not raise novel or complex issues of state law and do not substantially predominate over the federal claims. There are, further, no exceptional circumstances compelling declining state law claims.

8.      Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(1) because a plurality of Defendants maintain residence or offices in Los Angeles County, and most Defendants are residents of California (within the meaning of 28 U.S.C. § 1391(c)). Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

9.      Plaintiff Rogan O'Handley resides in St. Petersburg, Florida. He is an attorney licensed to practice in the state of California, social media influencer with over 3 million combined followers across various social media platforms, civil rights activist, political commentator, and journalist.



Complaint                                                                 Case No.

10.     Defendant Alex Padilla ("Padilla"), sued in his personal capacity, was California Secretary of State at the time of the injury to Plaintiff, authorized the disputed contract with Defendant SKDK, and oversaw the efforts to take down disfavored speech. Upon information and belief, Defendant Padilla is a resident of Los Angeles County.

11.     Defendant SKDKnickerbocker LLC ("SKDK") is a public affairs and consulting firm known for working with Democrat politicians and political hopefuls, and for progressive political causes. SKDK is a Delaware company that maintains a California office at 3105 S. La Cienega Blvd., Los Angeles, CA 90016.

12.     Defendant Paula Valle Castañon ("Ms. Castañon"), upon information and belief previously going by the name of Paula Valle, sued in her personal capacity, at the time of Plaintiff's injury served as the Deputy Secretary of State, Chief Communications Officer for Alex Padilla, California Secretary of State. Ms. Castañon led the communications division of the Office of the Secretary of State. Upon information and belief, Ms. Castañon is a resident of Los Angeles County.

13.     Defendant Jenna Dresner ("Ms. Dresner"), sued in her personal capacity, is Senior Public Information Officer for the OEC. Upon information and belief, Ms. Dresner is a resident of Los Angeles County.

14.     Defendant Sam Mahood ("Mr. Mahood"), sued in his personal capacity, was Press Secretary for California Secretary of State Alex Padilla, and one of the OEC employees responsible for receiving reports of alleged election misinformation from Defendant SKDK and requesting social media platforms censor speech with which the OEC disagreed during the 2020 election. When Mr. Padilla was elevated to become United States Senator from California, Sam Mahood followed Mr. Padilla to become his Special Projects and Communications Advisor. Upon information and belief, Mr. Mahood is a resident of Sacramento County.

15.     Defendant Akilah Jones ("Ms. Jones"), sued in her personal capacity, was OEC's Social Media Coordinator responsible for receiving reports of election

Complaint                                                                                          Case No.

misinformation from Defendant SKDK and requesting social media platforms censor speech with which the OEC disagreed during the 2020 election. Upon information and belief, Ms. Jones is a resident of Sacramento County.

16.     Defendant Shirley N. Weber, sued in her official capacity as California Secretary of State, is the state official responsible for implementing California Elections Code §10.5. and has oversight over the actions of the OEC. She maintains an office in Sacramento County.

17.     Defendant Twitter is a microblogging and social networking service with roughly 330 million monthly active users. Twitter is incorporated in Delaware and maintains its principal place of business at 1355 Market Street, Suite 900, San Francisco, CA 94103.

18.     Defendant National Association of Secretaries of State is a professional organization for state Secretaries of State, headquartered at 444 North Capitol Street NW, Suite 401, Washington, D.C., 20001.  The National Association of Secretaries of State does business in California, and the California Secretary of State is an association member.

## FACTS

19.     In 2018, the California legislature passed, and then-Governor Brown signed, AB 3075, which created the OEC within the California Secretary of State's office.

20.     Codified at California Elections Code §10.5, one of the "primary missions" of the OEC is "[t]o monitor and counteract false or misleading information regarding the electoral process that is published online or on other platforms and that may suppress voter participation or cause confusion and disruption of the orderly and secure administration of elections." Cal.Elec.Code § 10.5(b)(2).

21.     California Elections Code § 10.5 further states the OEC shall, "[a]ssess the false or misleading information regarding the electoral process described in paragraph (2) of subdivision (b), mitigate the false or misleading information, and

Complaint                                                                                          Case No.

1   educate voters, especially new and unregistered voters, with valid information from

2   elections officials such as a county elections officials or the Secretary of State."

3   Cal.Elec.Code § 10.5(c)(8).

4        22.   The OEC, under the direction of then-Secretary of State Padilla, seized on

5   the statutory phrase "mitigate [] false or misleading information," as a license to quash

6   politically-disfavored or inconvenient speech.

7        23.   Padilla's censorship program targeted speech implicating his

8   administration of elections in his capacity as Secretary of State.

9        24.   In a written response to CalMatters reporter Freddy Brewster's November

10  2020 inquiry regarding how OEC handled "voter misinformation," the OEC explained:

11  "[O]ur priority is working closely with social media companies to be proactive so when

12  there's a source of misinformation, we can contain it." A true and correct copy of

13  OEC's comments, as obtained through a public record request, is attached to this

14  complaint as Exhibit 1.

15       25.   The OEC further explained the close working relationship with private

16  social media companies thus:

17       We have working relationships and dedicated reporting pathways at

18       each major social media company. When we receive a report of

19       misinformation on a source where we don't have a pre existing pathway

20       to report, we find one. We've found that many social media companies

21       are taking responsibility on themselves to do this work as well. **We**

22       **work[] closely and proactively with social media companies to** keep

23       misinformation from spreading, **take down sources of misinformation**

24       **as needed,** and promote our accurate, official election information at

25       every opportunity.

26  See Exhibit 1 (emphasis added).

27       26.   The National Association of Secretaries of State ("NASS") spearheaded

28  efforts to censor disfavored election speech.



Complaint                                                                    Case No.

27.     NASS created direct channels of communication between Secretaries of States' staff and social media companies to facilitate the quick take-down of speech deemed "misinformation."

28.     For instance, NASS Director of Communications Maria Benson stated in email that Twitter asked her to let Secretaries of States' offices know that it had created a separate dedicated way for election officials to "flag concerns directly to Twitter." A true and correct copy of Maria Benson's October 1, 2020, email, as obtained through a public records request, is attached to this complaint as Exhibit 2.

29.     NASS's dedicated reporting channel to Twitter, according to Maria Benson, would get Secretaries of States' employees' censorship requests "bumped to the head of the queue." A true and correct copy of Maria Benson's August 8, 2020, email, as obtained through a public record request, is attached to this complaint as Exhibit 3.

30.     NASS asked its members to give it a "heads up" when officials saw mis- or disinformation on social platforms to help NASS "create a more national narrative." A true and correct copy of Maria Benson's August 8, 2020, email, as obtained through a public record request, is attached to this complaint as Exhibit 4.

31.     NASS wanted election officials to have NASS's email guidance regarding how to report "mis/disinformation" directly to social media companies "handy" directly prior to election day as election officials "prepare[d] for battle." A true and correct copy of Maria Benson's November 2, 2020, email, as obtained through a public record request, is attached to this complaint as Exhibit 4.

32.     The California Secretary of State's office participated in Twitter's dedicated "Partner Support Portal."

33.     Presumably, the California Secretary of State's office's participation in Twitter's "Partner Support Portal" did ensure the Secretary of State's requests to take down speech were a high priority for Twitter.

//

Complaint                                                                                    Case No.

34.     As an example, on December 30, 2019, Mr. Mahood emailed Twitter's Kevin Kane the following regarding another Twitter user (not Mr. O'Handley):

On Mon, Dec 30, 2019 at 9:05 PM Mahood, Sam <███████████████> wrote:

Hi Kevin,

Flagging the following tweet that I reported through the partner portal. This tweet is sharing a doctored image of a California Voter Registration Card (inaccurately claiming that the Republican Party is not an option):
https://twitter.com/Paul_USAPatriot/status/1211709756311621633

We would like this tweet taken down ASAP to avoid the spread of election misinformation.

Please let us know if there is anything else we can do to facilitate this request.

Thank you,

-Sam

35.     Kevin Kane responded to Sam Mahood's request to take down the tweet before 8:00 am the next morning, which happened to be New Year's Eve, stating:

**To:**      Mahood, Sam [███████████]
**Cc:**      Reyes, Steve [████████████]; Vaile, Paula [██████████████] tch, Inc.
**From:**    Kevin Kane [██████████████]
**Sent:**    Tue 12/31/2019 7:51:23 AM (UTC-08:00)
**Subject:** Re: Fw: Case# 0136918935: partner_election [ref:00DA0000000K0A8.5004A00001qaD26:ref]

Sam-

Thank you for reporting, this Tweet has been removed. Please don't hesitate to contact me if there is anything else we can do.

Best regards,

Kevin

See Exhibit 5.

36.     At the same time OEC officials and NASS were working externally to streamline their speech takedown processes with social media companies, the OEC also decided to broaden and outsource its efforts to search out "objectionable" speech to censor.

//

9



Complaint                                                                    Case No.

37.     On July 17, 2020, Padilla's office sent an email to fifteen political consultants and political affairs professionals, many of whom worked on the campaigns of prominent Democrats, offering them the opportunity to participate in an invitation-only, expedited bidding process outside California's Public Contract Code's mandated transparent competitive bid process. The winning bid would facilitate the office's $35-million-dollar "Vote Safe California" initiative.

38.     The purpose of the Public Contract Code's mandated transparent competitive bid process is to protect taxpayers against cronyism and partisanship.

39.     Mr. Padilla sidestepped the Public Contract Code's statutory bidding requirements by claiming he had "emergency authority" to create the contract.

40.     Padilla received seven bids from the OEC's hand-picked list of political consultants/allies.

41.     Padilla's staff, in a closed-door review process, anointed the winner of the $35-million-dollar contract.

42.     Padilla awarded the $35-million-dollar contract to Defendant SKDKnickerbocker ("SKDK"), a political consulting firm heavily involved in then-candidate Joe Biden's presidential campaign.

43.     As described by Reuters.com, "SKDK is closely associated with the Democratic Party, having worked on six presidential campaigns and numerous congressional races." See Joel Schechtman, Raphael Satter, Christopher Bing, Joseph Menn, Exclusive: Microsoft believes Russians that hacked Clinton targeted Biden campaign firm – sources, REUTERS (Sept. 10, 2020, 12:30 am), https://www.reuters.com/article/us-usa-election-cyber-biden-exclusive/exclusive-russian-state-hackers-suspected-in-targeting-biden-campaign-firm-sources-idUSKBN2610I4.

44.     Padilla's contract award to SKDK raised bipartisan ire, for different reasons.

//

Complaint                                                                    Case No.

45.    Congressional and State Republicans questioned the appropriateness of SKDK, which publicly boasted its involvement and support for one of the presidential candidates on the ballot, spending taxpayer dollars to create and administer a "non-partisan" voter information campaign at the behest of a partisan Democrat public official.

46.    Additionally, at the time of the award, Padilla was reportedly already under consideration to fill then Vice-Presidential candidate Kamala Harris's California Senate seat, should Biden/Harris win the presidential Election. See Bee Editorial Board, If Gavin Newsom picks Alex Padilla for the U.S. Senate, who owns his $34 million mess?, (December 17, 2020) https://www.sacbee.com/opinion/editorials/article247894900.html.

47.    Padilla's considerable investment of taxpayer dollars to a Biden-ticket associated firm, when he presumably stood to personally benefit from that ticket's elevation to higher office, smacked of a conflict of interest. Id.

48.    Further, Fabian Núñez, former Assembly Democratic speaker and partner at losing bidder Mercury Public Affairs, also raised significant questions regarding the contract award. Emily Hoeven, Will state stick 'Team Biden' firm with $35 million tab after Yee balks at Padilla vote contract?, CALMATTERS.ORG (November 23, 2020), https://calmatters.org/politics/2020/11/biden-firm-california-vote-contract-padilla-yee/.

49.    Núñez filed a formal protest with the Secretary of State stating SKDK's proposal contained "material violations" that led to SKDK having a "significant and profound unfair advantage in winning the work." Id.

50.    Núñez requested the Secretary of State administer "[a] fair bidding process in which all responsible bidders are evaluated by the exact same rules [as] the public and all bidders expect." Id.

//

//




Complaint                                                                                    Case No.

51.     Padilla's office rejected Núñez's protest on Sept. 1, stating that "common procedures or practices applicable to competitive bid agreements … do not apply for the process used for an emergency contract." *Id.*

52.     In addition to a suspect process, Padilla awarded this contract despite having no budgetary authority for it.

53.     Padilla's lack of budgetary authority to award the contract led California State Controller Betty Yee to reject paying SKDK in a public and drawn-out battle over the state's budgetary authority. Associated Press, <u>California lawmakers ok payment for voter outreach campaign</u>, Fox 40 (February 23, 2021, 9:21 AM) <u>https://fox40.com/news/california-connection/california-lawmakers-ok-payment-for-voter-outreach-campaign/</u>.

54.     SKDK did not receive payment until February 2021, after Padilla's elevation to be California's next Senator. *Id.*

55.     In February 2021, by a party line vote, the California legislature agreed to pay Padilla's past due bills to SKDK. *Id.*

56.     While the controversy over the contract raged, SKDK rapidly went to work as a hatchet for hire to target Padilla's political enemies, relabeling even innocuous speech that criticized Padilla's handling of election administration as "false" and "dangerous" attempts at voter suppression and voter fraud.

57.     Using state funds, SKDK created political hit lists of disfavored speech, which Defendants called a "Misinformation Daily Briefing."

58.     These "Misinformation Daily Briefings" were sent via email to Defendants Paula Valle Castañon, Jenna Dresner, Sam Mahood, and Akilah Jones at the California Secretary of State's communications office. A true and correct copy of one such "Misinformation Daily Briefing" from November 13, 2020, is attached to this complaint as Exhibit 6.

59.     The OEC curated the "misinformation" contained in the misinformation daily briefings for submission to social media companies.

Complaint                                                                                          Case No.

1      60.    The OEC reported "misinformation" to social media companies directly.

2      61.    The OEC also reported "misinformation" to social media companies

3  through NASS.

4      62.    Alex Padilla was proud of the OEC's speech-censoring activities and

5  track record, as was NASS.

6      63.    NASS has an annual award called the Innovation, Dedication, Excellence

7  & Achievement in Service ("IDEAS") award, recognizing "significant state

8  contributions to the mission of NASS."

9      64.    The California Secretary of State's office won NASS's 2020 award for

10 the OEC's work. Specifically noted in OEC's IDEAS award application was the

11 following:

12
13     The Office of Election Cybersecurity created VoteSure, which was a first-of-its-kind public education initiative to promote
       trusted, accurate, and official sources of election information on Facebook, Instagram, and Twitter. The goal of
14     VoteSure was to increase voter awareness about election misinformation online and provide official, trusted election
       resources.

15

16     …

17     Election security continues to be a top priority for the Secretary of State's office, and we are continuing to work around the
18     clock to protect the integrity of our systems ahead of Election 2020 and to combat misinformation through our Office of
       Election Cybersecurity.

19

20     …

21
22     The Office of Election Cybersecurity discovered nearly 300 erroneous or misleading social media posts that were
       identified and forwarded to Facebook and Twitter to review and 98 percent of those posts were

23     promptly removed for violating the respective social media company's community standards.

24

25

26

27

28



Complaint                                                                    Case No.

65.   Alex Padilla also stated his support for the OEC's speech-censoring activities in response to receiving the award, touting the initiative's "proactive social media monitoring":

We worked in partnership with social media platforms to develop more efficient reporting procedures for potential misinformation. Misinformation identified by our office or voters was promptly reviewed and, in most cases, removed by the social media platforms.

A true and correct copy of the OEC's NASS 2020 IDEAs award submission and NASS's press release announcing presentation of the award are attached as Exhibits 7 and 8.

66.   Defendants' carefully crafted propaganda campaign, or as they called it, "national narrative," suppressed the protected speech of citizens who might seek greater government accountability or ask questions regarding election processes.

67.   This self-serving "national narrative," conveniently, also bolstered and protected certain Defendants' political fortunes.

68.   The "national narrative" advanced by the California censorship scheme included supporting the victory of SKDK's client Joe Biden, the elevation of California Senator Kamala Harris to the Vice Presidency, and creating an opening for Padilla himself to be elevated to the position of United States Senator from California. Padilla's "one simple trick" of awarding an ultra vires censorship contract to a political ally, created a Rube-Goldberg-like contraption catapulting him to Washington, D.C.

69.   Mr. O'Handley, under the social media handle "DC_Draino," was one of the many speakers targeted by Defendants for his speech about the election, supposedly too dangerous for a gullible public to be allowed to read.

70.   Mr. O'Handley has a law degree from the University of Chicago Law School and is licensed to practice law in the state of California. After six-plus years practicing corporate and entertainment law, Mr. O'Handley left private practice in order to better utilize his legal education in defense of liberty and constitutional ideals.

14

Complaint                                                                Case No.



His primary efforts focus on social media postings, public speaking at colleges and political conferences, and being a political commentator. As one measure of his influence, he has had over 75 national news network appearances in the last year and half.   Mr. O'Handley's combined social media following across all his accounts currently reaches over 3 million people. He was invited to the White House social media summit in 2019, which focused, ironically, on the censorship of conservative voices on social media.

71.    By the end of November 2020, Mr. O'Handley had approximately 420,000 Twitter followers. Just six months prior in May 2020, Mr. O'Handley had approximately 89,000 Twitter followers, meaning Mr. O'Handley had over a 371% increase in followers in the lead up to the 2020 election and in the following weeks as votes were counted and state legislatures certified the electoral college.



Complaint                                                                     Case No.

1    72.    Mr. O'Handley authored a November 12, 2020, Twitter post stating:



(Hereinafter, the "Post").

73.    Mr. O'Handley's Post expressed an opinion widely held by California voters. An October 2020 poll by Berkeley's Institute of Government Studies released found that four in ten Californians "express[ed] skepticism that [the 2020] presidential election [would] be conducted in a way that's fair and open."

74.    Despite the Post's expression of Mr. O'Handley's personal opinion regarding the need for greater accountability in election processes—core political speech directly questioning Padilla's administration of and fitness for his political office—SKDK labeled the Post as "misinformation," and flagged the Post for the OEC to potentially target with its broad government powers:



16



75.   The OEC, following the recommendation of the Democrat operatives at SKDK, flagged the Post as "Case# 0180994675" under the indicator of "voter fraud," and color coded it as an "orange" level threat in internal OEC documents. Upon information and belief, an orange threat level indicates moderately problematic speech between yellow and red.

76.   On November 17, 2020, at 12:31 PM, a Secretary of State agent or staff member sent Twitter the following message regarding Mr. O'Handley's Post:

| Case# 0180994675: partner_election [ref:00DA0000000K0A8.5004w0000225CNh:ref] | 11/17/20 | 12:31 PM | Hi, We wanted to flag this Twitter post: https://twitter.com/DC_Draino/status/1327073866578096129 From user @DC_Draino. In this post user claims California of being a culprit of voter fraud, and ignores the fact that we do audit votes. This is a blatant disregard to how our voting process works and creates disinformation and distrust among the general public. |
|---|---|---|---|

77.   Shortly after Padilla's agent or staff member "flagged" Mr. O'Handley's post to Twitter, Twitter subsequently appended commentary asserting that Mr. O'Handley's claim about election fraud was disputed. A true and correct copy of OEC's comments, as obtained through public record request, is attached to this complaint as Exhibit 9.

78.   Twitter then added a "strike" to Mr. O'Handley's account.

79.   Twitter utilizes a strike system, whereby users incurring "strikes" face progressive penalties, culminating in removal from Twitter altogether after five strikes.

80.   The OEC tracked Twitter's actions on internal spreadsheets and noted that Twitter had acted upon the request to censor Mr. O'Handley's speech.

81.   Prior to OEC requesting Twitter censor the Post, Twitter had never before suspended Mr. O'Handley's account or given him any strikes. He suddenly became a target of Twitter's speech police, at the behest of Defendants.

//



Complaint                                                                Case No.

82.    Between November 2020 and January 2021, Mr. O'Handley's Twitter following continued to grow. By January 2021, Mr. O'Handley had over 444,000 Twitter followers.

83.    During this time period, Mr. O'Handley was far from the only speaker on Twitter suggesting the need for an audit or the existence of voter fraud in the aftermath of the 2020 election. Countless individuals suggesting the need for audits, including both Democrat and Republican voices upset at perceived problems. Numerous commentators, appearing to support Democrats, voiced their opinion of a need to audit results in conservative areas where Republicans fared better in down ballot races than expected. Yet, Defendants focused their speech censorship efforts on conservative requests for transparency in election processes rather than the same calls from self-identified political liberals.

84.    On January 18, 2021, Mr. O'Handley posted the following tweet, for which Twitter gave Mr. O'Handley a strike.



Rogan O'Handley 🇺🇸
@DC_Draino                    ...

When your country is stolen and you aren't even allowed to talk about it, that's not freedom

It's fascism

ⓘ This claim of election fraud is disputed,
   and this Tweet can't be replied to,              ›
   Retweeted, or liked due to a risk of violence

11:14 AM · 1/18/21 · Twitter for iPhone



Complaint                                                    Case No.

85.     On January 21, 2021, Mr. O'Handley posted another Tweet, for which Twitter gave Mr. O'Handley a strike.



Rogan O'Handley 🇺🇸
@DC_Draino

We are captives under a government we didn't elect

It was forced upon us

That is by definition a dictatorship

⓵ This claim of election fraud is disputed, and this Tweet can't be replied to, Retweeted, or liked due to a risk of violence   ❯

6:44 PM · 1/21/21 · Twitter for iPhone

Complaint                                                                                      Case No.

86.     On January 22, 2021, Mr. O'Handley suggested via Tweet that the government consider facilitating a 9/11-style commission to study the 2020 election, stating it is an "emergency" issue when half the country stops believing in the integrity of the vote. Twitter again gave Mr. O'Handley a strike and locked his account for seven days, stating the Tweet included a claim of election fraud which was disputed.



How about a 9/11 commission-style report on what the hell just happened this past election?!

When half our country stops believing in the integrity of our vote, that's an *emergency* issue

⚠ This claim of election fraud is disputed, and this Tweet can't be replied to, Retweeted, or liked due to a risk of violence  ›



Complaint

Case No.

87. On February 22, 2021, Mr. O'Handley Tweeted the following:





Complaint                                                                 Case No.

88.   In response, Twitter permanently suspended Mr. O'Handley's account stating:



Hello,

Your account, DC_Draino has been suspended for violating the Twitter Rules.

Specifically, for:

**Violating our rules about election integrity.**
You may not use Twitter's services for the purpose of manipulating or interfering in elections. This includes posting or sharing content that may suppress voter turnout or mislead people about when, where, or how to vote.

89.   Twitter never elaborated on how Mr. O'Handley's five-word Tweet and photograph of the U.S. Capitol (incidentally, Mr. Padilla's new workplace)—which was posted well after the 2020 election had been certified and a new President installed in office—manipulated or interfered with an election, suppressed voter turnout, or misled people about when, where, or how to vote. Indeed, at the time of the post, the next national general election was nearly two years away.

90.   Twitter serves as the primary social channel for political commentary and news in American society at present.

91.   As a rising political commentator, Twitter's ban has had a direct and detrimental impact on Mr. O'Handley's ability to make a living in his chosen profession.

92.   In January 2021, O'Handley had well over 440,000 followers on Twitter.



Complaint                                                          Case No.

93.    O'Handley's reach, which was growing exponentially at the time of his permanent ban, had garnered him paid media contract offers, numerous media appearances, paid speaking opportunities, valuable professional networking, endorsements, and advertising dollars.

94.    Mr. O'Handley lost his platform to communicate with his followers, irreparably damaging his business, which depends on the reach of his audience for revenue.

95.    Asking to audit an election to protect the integrity of elections is not "voter fraud." It is a regular practice of election administration.

96.    Suggesting the country consider a non-partisan commission to study the election in an attempt to restore the country's trust in the integrity of the voting process is not a factual claim, and certainly not one that includes a risk of violence.

97.    The statement "Most votes in American history" is a true fact about the 2020 presidential election.

98.    Truthful speech and opinion about elections and elected officials has been protected by the First Amendment since our nation's founding. The right to criticize the government is the basis upon which this country was founded. Yet Defendants targeted Mr. O'Handley's speech for censorship because of his criticism of the government, a direct affront to our constitutional ideals.

99.    Upon information and belief, discovery will show Twitter's stated reasons for suspending Mr. O'Handley were pretextual. Twitter's real reasons for suspending Mr. O'Handley do not stem from a violation of Twitter's terms of service, but from the content of his speech raising concerns about election administration and integrity, specifically concerns related to the work of then-California Secretary of State Alex Padilla. The trigger for Twitter's censorship of Mr. O'Handley was its coordination and conspiracy with other Defendants to silence the protected speech of many Americans.

//

Complaint                                                                                     Case No.

100. Defendants' government censorship of speech seeking to hold elected officials accountable for the exercise of their office is anathema to the Constitution. It strikes directly at the heart of the First Amendment.

## CLAIMS

### First Claim for Relief

### First Amendment – Free Speech (42 U.S.C. § 1983)
### (By Plaintiff Against All Defendants)

101. Mr. O'Handley incorporates by reference and re-alleges herein all Paragraphs above.

102. California Election Code § 10.5, as-applied by Defendants, violates the Free Speech clause of the First Amendment.

103. Defendants also used California Election Code § 10.5 to retaliate against Mr. O'Handley for his speech.

104. Political speech is core First Amendment speech, critical to the functioning of our republic.

105. Political speech rests on the highest rung of the hierarchy of First Amendment values.

106. Defendants weaponized California Election Code § 10.5 and the OEC to censor Plaintiff's political speech.

107. State action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.

108. Defendants' actions directly abridged Mr. O'Handley's protected political speech.

109. Defendants jointly acted in concert to abridge Mr. O'Handley's freedom of speech and deprive Mr. O'Handley of his First Amendment rights.

110. Defendants Twitter, SKDK, and NASS willfully and cooperatively participated in the government Defendants' efforts to censor Mr. O'Handley's political speech.

24



111. Defendants Alex Padilla, Paula Valle Castañon, Jenna Dresner, Sam Mahood, Akilah Jones deprived Mr. O'Handley of his First Amendment free speech rights acting under color of state law, and Mr. O'Handley's free speech rights were clearly established at the time of Defendants' speech chilling actions.

112. Defendants Alex Padilla, Paula Valle Castañon, Jenna Dresner, Sam Mahood, Akilah Jones, acting in their official capacities, took action, jointly with SKDK, Twitter, and NASS, against Mr. O'Handley with the intent to retaliate against, obstruct, or chill Mr. O'Handley's First Amendment rights.

113. Mr. O'Handley engaged in constitutionally protected activity through his speech questioning the conduct of elections and the actions of elected officials.

114. Defendants targeted and censored Mr. O'Handley's speech.

115. Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected activity.

116. The protected activity, Mr. O'Handley's speech which Defendants found objectionable, was a substantial motivating factor in Defendants' decision to censor Mr. O'Handley's speech.

117. Defendants' speech-chilling actions specifically and objectively infringed Mr. O'Handley's speech rights under the United States Constitution.

118. There was a clear nexus between Defendants' actions and the intent to chill Mr. O'Handley's speech.

119. Mr. O'Handley suffered economic and reputational injuries, among others, as a result.

120. Defendants' restriction of Mr. O'Handley's speech was content-based.

121. Defendants had no compelling state interest for that content-based restriction.

122. Defendants' blanket speech restriction was not narrowly tailored.

//

//



Complaint                                                          Case No.

123.    Mr. O'Handley has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from violating his constitutional rights.

124.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. O'Handley is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

125.    Mr. O'Handley finds it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**Second Claim for Relief**

**California Constitution art. I § 2 – Free Speech**

**(By Mr. O'Handley Against All Defendants)**

126.    Mr. O'Handley incorporates by reference and re-alleges herein all Paragraphs above.

127.    In California "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. Art. 1, §2.

128.    The California Constitution is more protective, definitive and inclusive of rights to expression and speech than the First Amendment to the United States Constitution.

129.    California courts look to whether individuals have been invited to a forum, and if so, the California Constitution protects speech and petitioning even in instances when the venue in which the speech happens is privately owned so long as the speech does not interfere with normal business operations.

130.    Courts ask whether the venue is an essential and invaluable forum for the rights of free speech and petition. If so, private property owners will not be permitted to prohibit expressive activity that would impinge on constitutional rights.

131.    Twitter regularly invites new users to utilize its speech forum.

//



Complaint                                                                      Case No.

132.   Mr. O'Handley's speech did not interfere with Twitter's normal business operations.

133.   Twitter is an essential and invaluable forum for the rights of free speech and petition.

134.   Twitter, therefore, may not prohibit expressive activity which impinges on constitutional rights.

135.   Quashing Mr. O'Handley's speech criticizing election processes and elected officials violates Mr. O'Handley's liberty of speech rights under the California Constitution.

136.   Mr. O'Handley has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined.

137.   Mr. O'Handley finds it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

### Third Claim for Relief
### Fourteenth Amendment - Equal Protection Discrimination (42 U.S.C. § 1983)
### (By Mr. O'Handley Against All Defendants)

138.   Mr. O'Handley incorporates by reference and re-alleges herein all Paragraphs above.

139.   Defendants acted to censor Mr. O'Handley's speech with discriminatory intent based on the content of his speech.

140.   Defendants' actions bear no rational relation to a legitimate end as Defendants' conduct here was malicious, irrational, or plainly arbitrary.

141.   Even if Defendants did have a rational basis for their acts, their alleged rational basis was a pretext for an impermissible motive.

142.   Defendants discriminatorily enforced the statute against Mr. O'Handley based on his viewpoint.

143.   Defendants' enforcement had a discriminatory effect.



Complaint                                                                 Case No.

1    144.    Defendants were motivated by a discriminatory purpose.

2    145.    Similarly situated individuals were not censored for their speech.

3    146.    Mr. O'Handley has no adequate remedy at law and will suffer serious and
4    irreparable harm to his constitutional rights unless Defendants are enjoined from
5    violating his constitutional rights.

6    147.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. O'Handley is entitled to
7    declaratory relief and temporary, preliminary, and permanent injunctive relief.

8    148.    Mr. O'Handley finds it necessary to engage the services of private counsel
9    to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of
10    attorneys' fees pursuant to 42 U.S.C. § 1988.

11    **Fourth Claim for Relief**

12    **Fourteenth Amendment - Due Process Clause (42 U.S.C. § 1983)**

13    **(By Mr. O'Handley Against Defendants California Secretary of State Shirley N.**
14    **Weber in her official capacity, SKDK, Twitter, Alex Padilla, Paula Valle**
15    **Castañon, Jenna Dresner, Sam Mahood, and Akilah Jones)**

16    149.    Mr. O'Handley incorporates by reference and re-alleges herein all
17    Paragraphs above.

18    150.    Mr. O'Handley had a property interest in pursuing his occupation as a
19    Twitter influencer and commentator.

20    151.    Mr. O'Handley also had a recognized protected interest in his business
21    goodwill.

22    152.    The California Secretary of State, SKDK, Alex Padilla, Paula Valle
23    Castañon, Jenna Dresner, Sam Mahood, and Akilah Jones set in motion a series of acts
24    which they knew or reasonably should have known would cause Twitter to inflict the
25    constitutional injury of depriving Plaintiff of his occupation and taking the business
26    goodwill he had garnered through his Twitter account.

27    153.    OES actions intentionally solicited Twitter to suspend Mr. O'Handley's
28    account.

28



Complaint                                                                    Case No.

154.   Some kind of hearing is required before depriving Mr. O'Handley either of his occupation or his property interest in his business goodwill.

155.   Mr. O'Handley was not given the opportunity to be heard at a meaningful time and in a meaningful manner.

156.   Mr. O'Handley has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from violating his constitutional rights.

157.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. O'Handley is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

158.   Mr. O'Handley founds it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**Fifth Claim for Relief**

**Fourteenth Amendment – Void for Vagueness (42 U.S.C. § 1983)**

**(By Mr. O'Handley Against Defendant California Secretary of State**

**Shirley N. Weber in her official capacity and Defendants Alex Padilla, Paula**

**Valle Castañon, Jenna Dresner, Sam Mahood, and Akilah Jones**

**in their personal capacities)**

159.   Mr. O'Handley incorporates by reference and re-alleges herein all Paragraphs above.

160.   Defendants' enforcement of California Elections Code §10.5 violates the Due Process Clause of the Fourteenth Amendment as-applied to Mr. O'Handley.

161.   Mr. O'Handley should not have been punished for behavior he could not have known allegedly violated the law.

162.   California Elections Code §10.5 is impermissibly vague because it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

//



Complaint                                                                                    Case No.

163.   This statute is capable of, and did in fact, reach expression sheltered by the First Amendment, therefore requiring greater specificity.

164.   Mr. O'Handley has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from violating his constitutional rights.

165.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. O'Handley is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

166.   Mr. O'Handley finds it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Sixth Claim for Relief
### Civil Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985)
### (By Mr. O'Handley Against All Defendants)

167.   Mr. O'Handley incorporates by reference and re-alleges herein all Paragraphs above.

168.   Defendants had a meeting of the minds to violate the constitutional rights of individuals who questioned election processes and outcomes — or in Defendants' words, spread "misinformation."

169.   Defendants, through agreements and processes they jointly created to seek out and swiftly censor speech with which they disagreed, intended to accomplish the unlawful objective of abridging these individuals' freedom of speech.

170.   SKDK, Twitter, and NASS joined with the state agents to jointly deprive Mr. O'Handley of his rights.

171.   Each conspiracy participant shared the common objective of the conspiracy, to censor speech which they found objectionable or "misleading."

172.   As a result of their agreement, Defendants actually deprived Mr. O'Handley of his First and Fourteenth Amendment rights, as described herein.
//



Complaint                                                                                   Case No.

173.   Mr. O'Handley suffered economic and reputational injuries, among others, as a result.

174.   Mr. O'Handley has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from violating his constitutional rights.

175.   Pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, Mr. O'Handley is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

176.   Mr. O'Handley finds it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. O'Handley prays this Court grant the relief requested herein, specifically that the Court render the following judgment in Mr. O'Handley's favor and against Defendants:

**i.**   Declaratory Judgment: For entry of a Declaratory Judgment that California Election Code § 10.5, as applied to Mr. O'Handley, violates Mr. O'Handley's state and federal constitutional rights to free speech, equal protection, and due process;

**ii.**   Injunctive Relief: For entry of a Permanent Injunction stating that the Secretary of State and the OEC may not censor speech, work to take down the speech of private speakers, selectively enforce speech restrictions, or discriminate against those who seek to hold the current office holder accountable for perceived defects in election administration;

**iii.**   Damages: general, nominal, statutory (pursuant to Cal. Civ. Code § 52) and exemplary damages, in an amount to be determined at trial;

**iv.**   Attorneys' fees and costs: awarded pursuant to 42 U.S.C. § 1988; California Code of Civil Procedure Section 1021.5; Cal. Civ. Code § 52; and



Complaint                                                                                Case No.

**v.** Pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, Plaintiff is entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining Defendants' enforcement of California Election Code § 10.5; damages from the businesses and persons sued in their personal capacities; and attorneys' fees.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

DHILLON LAW GROUP INC.

Date: June 17, 2021

By:     /s/ Harmeet K. Dhillon
HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
RONALD D. COLEMAN
(*pro hac vice* pending)
rcoleman@dhillonlaw.com
KARIN M. SWEIGART (SBN: 247462)
ksweigart@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

MARK E. TRAMMELL
(*pro hac vice* pending)
mtrammell@libertycenter.org
CENTER FOR AMERICAN LIBERTY
5100 Buckeystown Pike, Suite 250
Frederick, MD 21704
Telephone: (703) 687-6212
Facsimile: (517) 465-9683

Attorneys for Plaintiff ROGAN
O'HANDLEY

32



Complaint                                                          Case No.