IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROGAN O'HANDLEY,

    Plaintiff,

v.

ALEX PADILLA, et al.,

    Defendants.

Case No. 21-cv-07063-CRB

**ORDER GRANTING MOTIONS TO DISMISS**

Plaintiff Rogan O'Handley believes that he is the victim of a conspiracy to censor conservative voices surrounding the 2020 Presidential Election. See generally Compl. (dkt. 1). After Twitter appended labels to several of O'Handley's tweets and then permanently suspended his Twitter account, O'Handley brought suit against Twitter, as well as three other sets of defendants with whom he contends Twitter conspired: State defendants (Dr. Shirley Weber, in her official capacity as California Secretary of State, Jenna Dresner, Akilah Jones, Sam Mahood, Paula Valle, and former Secretary of State Alex Padilla); a private contractor, SKDKnickerbocker ("SKDK"); and the National Association of Secretaries of State ("NASS"). Id. Each of those four sets of defendants has now brought a motion to dismiss, and Twitter has brought a Motion to Strike Count II of the Complaint under California's anti-SLAPP statute.[1] See generally Twitter MTD (dkt. 60); State MTD (dkt. 59); SKDK MTD (dkt. 57); NASS MTD (dkt. 58); Twitter Anti-SLAPP (dkt. 61). The Court held a motion hearing on December 16, 2021. See Motion Hearing (dkt. 85). As discussed below, the Court GRANTS the motions to dismiss, and does not reach the anti-SLAPP motion.

---

[1] This refers to California's Anti-Strategic Lawsuits Against Public Participation statute, Cal. Civ. Proc. Code § 425.16(b)(1).

United States District Court
Northern District of California

United States District Court
Northern District of California

I.      **BACKGROUND**[2]

    A.      **Parties and Actions Leading Up to Enforcement Action**

        1.      **O'Handley**

O'Handley, an attorney licensed to practice in California, makes his living as a political commentator.  Compl. ¶ 9.  He alleges that he "left private practice in order to better utilize his legal education in defense of liberty and constitutional ideals."  Id. ¶ 70.  He posts on social media, speaks at colleges and political conferences, and comments on television.  Id.  O'Handley's social media handle is "DC_Draino"; in the lead-up to the 2020 election, DC_Draino had 420,000 Twitter followers.  Id. ¶¶ 69, 71.

        2.      **Twitter**

Twitter is a social media platform with roughly 330 million monthly active users.  Id. ¶ 17.  Twitter has content-moderation policies called the Twitter Rules that are designed, among other things, to minimize the reach of harmful and misleading information.  See Twitter, The Twitter Rules, https://help.twitter.com/en/rules-and-policies/twitter-rules.[3]  The rules are publicly available on Twitter's website.  Id.  In the User Agreement, to which individuals agree as a condition of using Twitter, Twitter reserves the right to remove content that violates the Twitter Rules.  See Twitter, Twitter Terms of Service, https://twitter.com/en/tos/previous/version_15 ("By using the Services you agree to be bound by these Terms"; "We reserve the right to remove Content that violates the User Agreement").

The relevant content-moderation policy in this case is the Civic Integrity Policy, which prohibits the posting of "false or misleading information intended to undermine public confidence in an election or other civic process."  See Civic Integrity Policy (1/12/21); Civic Integrity Policy (11/12/20); Civic Integrity Policy (5/27/20).[4]  That policy begins by explaining that "The public conversation occurring on Twitter is never more important than during elections" and that

---

[2] This Background section draws from the allegations in the Complaint and the facts of which the Court can take judicial notice.

[3] The Court takes judicial notice of the Twitter Rules as they are referenced in the Complaint and their authenticity is not questioned.  See Twitter MTD at 1 n.1.

[4] Copies of the relevant pages are at Sprankling Decl. (dkt. 60-1) Exs. C through F.  Twitter's Civic Integrity Policy is also the subject of the State Defendants' Request for Judicial Notice (dkt. 59-1), which the Court grants.

"attempts to undermine the integrity of our service is antithetical to our fundamental rights and undermines the core tenets of freedom of expression, the value upon which our company is based." Sprankling Decl. Ex. C (dkt. 60-4). It explains how to report violations of the Civic Integrity Policy, and states that Twitter will "work with select government and civil society partners . . . to provide additional channels for reporting and expedited review." Id.

One of the mechanisms for reporting suspected violations of the Twitter Rules is the Partner Support Portal. Compl. Ex. 2. The Portal was a priority pathway for persons and entities that Twitter believed had an interest in promoting civic processes "to flag concerns directly to Twitter," including "technical issues . . . and content on the platform that . . . may violate our policies." Id. Twitter granted access to the Portal to election officials from at least 38 states, including California. Compl. Ex. 3.

The Civic Integrity Policy of October 2020 defines what does and does not violate it, and states that Twitter will "label or remove false or misleading information intended to undermine public confidence in an election or other civic process." Sprankling Decl. Ex. D (dkt. 60-5). It explains that "[i]n circumstances where we do not remove content which violates this policy, we may provide additional context on Tweets," which "means we may . . . Apply a label and/or warning message to the content where it appears in the Twitter product," or "Provide a link to additional explanations or clarifications. . .," among other options. Id. It adds that "[f]or severe or repeated violations of this policy, accounts will be permanently suspended." Id.

On January 12, 2021, following the Capitol insurrection on January 6, 2021, Twitter announced that it had again updated its Civic Integrity Policy to "aggressively increase . . . enforcement action" in light of "misleading and false information surrounding the 2020 US presidential election [that] has been the basis for incitement to violence around the country." Sprankling Decl. Ex. E (dkt. 60-6). Twitter continued: "Ahead of the inauguration, we'll continue to monitor the situation, keep open lines of communication with law enforcement, and keep the public informed of additional enforcement actions." Id. Twitter instituted a five-strike enforcement protocol, pursuant to which enforcement actions became more severe as an account holder continued to violate the policy, progressing from no account-level action for one strike to

permanent suspension for five or more strikes.  See Sprankling Decl. Ex. F (dkt. 60-7); see also Compl. ¶ 78.

Twitter analyzes the reports it receives through the Portal: it determines that some of the reported tweets violate its Rules, and others do not.  While O'Handley contends that Twitter complied with the State defendants' requests to remove content 98% of the time, see Opp'n to State MTD (dkt. 68) at 1 ("98% of the [Office of Election Cybersecurity ('OEC')] reported posts were 'promptly removed'"), the underlying materials are less clear.  An excerpted OEC IDEAS award application in the Complaint allegedly stated that "The [OEC] discovered nearly 300 erroneous or misleading social media posts that were identified and forwarded to Facebook and Twitter to review and 98 percent of those posts were promptly removed for violating the respective social media company's community standards.").  Compl. ¶ 64 (emphasis added).  On the other hand, an OEC spreadsheet attached to the Complaint (involving content from Citizen, Facebook, Instagram, and Twitter) reflects that Twitter took no action on OEC-reported content in about one-third of the instances of alleged misinformation covered by that exhibit.  See Compl. Ex. 9 (numerous entries listing "No Action Taken").

### 3.    State Defendants

In 2018, in response to concerns about election interference in the 2016 presidential election, the California Legislature established the OEC within the Secretary of State's office to monitor and respond to potential interference with election security and integrity.  2018 Cal. Stat. c. 241, § 1.  OEC is "[t]o monitor and counteract false or misleading information regarding the electoral process that is published online or on other platforms and that may suppress voter participation or cause confusion and disruption of the orderly and secure administration of elections."  Cal. Elec. Code § 10.5(b)(2).  The statute directed OEC to undertake three functions: (1) "assess . . . false or misleading information regarding the electoral process"; (2) "mitigate the false or misleading information"; and (3) "educate voters . . . with valid information from election officials such as a county elections official or the Secretary of State."  Id.

Padilla was the Secretary of State at the time of O'Handley's alleged injury.  Compl. ¶ 10. Padilla authorized the contract with SKDK, discussed below, and, per the Complaint, "oversaw

the efforts to take down disfavored speech." Id.  The Complaint alleges that Padilla "was reportedly already under consideration to fill then Vice-Presidential candidate Kamala Harris's California seat" if the Biden/Harris ticket prevailed, and therefore "stood to personally benefit from that ticket's elevation to higher office." Id. ¶¶ 46, 47.  Weber, sued in her official capacity, is the current California Secretary of State. Id. ¶ 16.  And the four remaining State defendants— Dresner, Jones, Mahood, and Valle—are or were all employees of the Secretary of State's office.[5]

The Complaint quotes from what it asserts is an OEC response to a reporter's question in 2020 about how OEC handles voter misinformation.[6]  Compl. ¶ 25.  OEC allegedly responded that "We have working relationships and dedicated reporting pathways at each major social media company.  When we receive a report of misinformation on a source where we don't have a pre-existing pathway to report, we find one." Id., Ex. 1.  It continues: "We worked closely and proactively with social media companies to keep misinformation from spreading, take down sources of misinformation as needed, and promote our accurate, official election information at every opportunity." Id.

### 4. SKDK

In 2020, the California Secretary of State's Office recruited political consultants to help monitor misinformation online. Id. ¶ 37.  The Complaint alleges that many of those invited to bid were affiliated with the Democratic Party, and that Padilla ran afoul of the competitive bidding process in the course of awarding the contract. Id. ¶¶ 37–41.[7]  SKDK, "a public affairs and consulting firm known for working with Democrat[s]," id. ¶ 11, won the $35-million contract, id.

---

[5] The Complaint alleges that Valle was the Deputy Secretary of State, Chief Communications Officer for Padilla, id. ¶ 12, that Dresner was the Senior Public Information Officer for the OEC, id. ¶ 13, that Mahood was the Press Secretary for Padilla "and one of the OEC employees responsible for receiving reports of alleged election misinformation . . . and requesting social media platforms censor speech with which the OEC disagreed"), id. ¶ 14, and that Jones was OEC's Social Media Coordinator, responsible for receiving reports of election misinformation . . . and requesting social media platforms censor speech," id. ¶ 15.  The State's motion refers to all four as "current and former OEC employees."  State MTD at 3.

[6] This Exhibit has perplexing formatting and does not identify the title of the document, the date of the document, the author of the document, the source of the documents, or even the first question the document purports to answer.  See Compl. Ex. 1.

[7] The Complaint includes a number of allegations about the impropriety of the contract.  See Compl. ¶¶ 43–55.

United States District Court
Northern District of California

¶ 42.  It then allegedly "rapidly went to work as hatchet for hire to target Padilla's political enemies, relabeling even innocuous speech that criticized Padilla's handling of election administration as 'false' and 'dangerous' attempts at voter suppression and voter fraud."  Id. ¶ 56.

SKDK created a document called "Misinformation Daily Briefing," which it sent to Valle, Dresner, Mahood, and Jones at the California Secretary of State's office.  Id. ¶¶ 57–58.  The Complaint alleges that OEC would then "curate" the "misinformation" from those daily briefings to submit to social media companies.  Id. ¶ 59.

### 5.    NASS

NASS is a nonprofit professional organization for secretaries of state, headquartered in Washington, D.C.  Id. ¶ 18.  It is incorporated in Kentucky.  Reynolds Decl. (dkt. 58-1) ¶ 7. NASS is not a government agency.  Id. ¶ 4.  The Complaint alleges that NASS does business in California, and that the California Secretary of State is a member, Compl. ¶ 18, but NASS disputes that it has any presence in California, see NASS MTD at 9–10; Reynolds Decl. ¶ 8.

The Complaint alleges that NASS "spearheaded efforts to censor disfavored election speech."  Compl. ¶ 26.  It alleges that NASS did so by creating "direct channels of communication between Secretaries of States' staff and social media companies to facilitate the quick take-down of speech deemed 'misinformation.'"  Id. ¶ 27.  The Complaint cites to an email from NASS's Director of Communications stating that "Twitter asked her to let Secretary of States' offices know that it had created a separate dedicated way for election officials to 'flag concerns directly to Twitter.'"  Id. ¶ 28, Ex. 2 (10/1/20 email).  It cites to another email from the same individual at NASS, which explains that "if your state is onboarded into the partner support portal, it provides a mechanism to report election issues and get them bumped to the head of the queue."  Id. ¶ 29, Ex. 3 (8/28/20 email).  And it cites to an email in which the same individual, in the context of passing along reporting mechanisms for Facebook, Twitter, and Google, stated, "If you see something on a platform, please report it.  In addition, please pass this on to your local election officials as well.  I would also appreciate a heads up so I know what is going on, this helps us create a more national

United States District Court
Northern District of California

narrative." Id. ¶ 30, Ex. 4 (4/30/19 email).[8]

O'Handley alleges that OEC sometimes reported misinformation directly to social media companies and sometimes did so "through NASS." See id. ¶¶ 60–61.  He further alleges that NASS had an annual award that recognized "[s]ignificant state contributions to the mission of NASS," and that the California Secretary of State's office won the award in 2020 for OEC's work. Id. ¶¶ 63, 64.  In accepting the award, Padilla allegedly stated: "We worked in partnership with social media platforms to develop more efficient reporting procedures for potential misinformation.  Misinformation identified by our office or voters was promptly reviewed and, in most cases, removed by the social media platforms." Id. ¶ 65, Ex. 8.

**B.      Enforcement Action Regarding Certain O'Handley Tweets**

On November 12, 2020, just over a week after the 2020 Presidential Election, O'Handley tweeted the following: "Audit every California ballot / Election fraud is rampant nationwide and we all know California is one of the culprits / Do it to protect the integrity of that state's elections." Id. ¶ 72.  The following day, SKDK included O'Handley's tweet in its Misinformation Daily Briefing, which it emailed to Valle, Dresner, Mahood, and Jones. Id. ¶ 74.  Although the Complaint reads as though O'Handley's tweet was the only one SKDK sent to the State defendants that day, see id., it was one of eighteen articles or tweets included in the November 13 Misinformation Daily Briefing, see Compl. Ex. 6.  SKDK included no commentary about O'Handley's tweet; it just included it, along with other tweets and articles, under the heading "California." Id.

Four days after SKDK flagged O'Handley's tweet, "a Secretary of State agent or staff member"—not identified in the Complaint—included the tweet as one of 30 total posts for Twitter to review. See Compl. ¶ 76; Compl. Ex. 9.  The Secretary of State's office included the message:

> Hi, We wanted to flag this Twitter post:
> https://twitter.com/DC_Draino/status/1327073866578096129

---

[8] The Complaint alleges that this email directs election officials to keep NASS's guidance for reporting mis/disinformation handy as they "prepare[d] for battle," id. ¶ 31, but the document does not say this, see id. Ex. 4.

> From user @DC_Draino.  In this post user claims California of
> being a culprit of voter fraud, and ignores the fact that we do audit
> votes.
> This is a blatant disregard to how our voting process works and
> creates disinformation and distrust among the general public.

Id.  The Complaint does not allege that Twitter ever responded to the Secretary of State's office about O'Handley's tweet.  But Twitter subsequently applied a label to the tweet, adding text immediately below it that said: "This claim about election fraud is disputed."  Compl. ¶¶ 72, 77. The Complaint alleges that Twitter then added a strike to O'Handley's account.  Id. ¶ 78.

The other tweets at issue in the Complaint occurred more than two months later, shortly after the insurrection at the U.S. Capitol.  The Complaint does not allege that any of the other defendants communicated with Twitter about any of these subsequent tweets.  On January 18, 2021, two days before the inauguration, O'Handley tweeted: "When your country is stolen and you aren't even allowed to talk about it, that's not freedom / It's fascism."  Id. ¶ 84.  On January 21, 2021, he tweeted: "We are captives under a government we didn't elect / It was forced upon us / That is by definition a dictatorship."  Id. ¶ 85.  On January 22, 2021, he tweeted: "How about a 9/11 commission-style report on what the hell just happened this past election?!  When half our country stops believing in the integrity of our vote, that's an *emergency* issue."  Id. ¶ 86. Twitter allegedly applied the following label to each of those tweets: "This claim of election fraud is disputed, and this Tweet can't be replied to, Retweeted, or liked due to a risk of violence."  Id. ¶¶ 84–86.  The Complaint also alleges that Twitter treated each tweet as an additional strike against O'Handley's account, and locked his account for seven days after the fourth strike.  Id.

On February 22, 2021, O'Handley tweeted his last tweet: the words "'Most votes in American history'" in quotation marks above an image of the Capitol building with a fence around it.  Id. ¶ 87.  In response to that tweet, Twitter permanently suspended O'Handley's account.  Id. ¶ 88.  It then sent him the following message:

> Hello,
> Your account, DC_Draino has been suspended for violating the
> Twitter Rules.
> Specifically, for:
> Violating our rules about election integrity.
> You may not use Twitter's services for the purpose of manipulating
> or interfering in elections.  This includes posting or sharing content

United States District Court
Northern District of California

1                       that may suppress voter turnout or mislead people about when,
                    where, or how to vote.

2   Id.

3         O'Handley alleges that "As a rising political commentator, Twitter's ban has had a direct

4   and detrimental impact on [his] ability to make a living in his chosen profession." Id. ¶ 91.  He

5   claims to have "lost his platform to communicate with his followers." Id. ¶ 94.[9]

6        **C.**    **Procedural History**

7         O'Handley challenges Twitter's decisions to label his tweets and to permanently suspend

8   his account.  See generally id.  He does not dispute that Twitter has rules that govern the use of its

9   platform.  Id. ¶ 99 (acknowledging that Twitter has Terms of Service).  Instead, he asserts that

10  "Twitter's stated reasons for suspending [him] were pretextual," and that it coordinated and

11  conspired with the State defendants, SKDK, and NASS to censor him "because of his criticism of

12  the government."  Id. ¶¶ 98, 99.  Based on this theory, he brings suit for: (1) violation of the First

13  Amendment (42 U.S.C. § 1983), against all Defendants; (2) violation of the California

14  Constitution (Free Speech clause), against all Defendants; (3) violation of the Equal Protection

15  Clause (42 U.S.C. § 1983), against all Defendants; (4) violation of the Due Process Clause (42

16  U.S.C. § 1983), against SKDK, Twitter, and the State defendants; (5) a Void for Vagueness

17  challenge (42 U.S.C. § 1983) to California Elections Code § 10.5, against the State defendants

18  only; and (6) civil conspiracy (42 U.S.C. § 1985), against all Defendants.  See id. ¶¶ 101–76.

19        All of the defendants move to dismiss, and Twitter moves to strike the California

20  Constitutional claim.  Twitter MTD; State MTD; SKDK MTD; NASS MTD; Twitter Anti-

21  SLAPP.

22  **II.**    **LEGAL STANDARD**

23       **A.**    **12(b)(6) Motion to Dismiss**

24        All of the defendants move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

25  Procedure.  Twitter MTD at 6; State MTD at 6–7; NASS MTD at 8; SKDK MTD at 3–4.

26

27  ———————————
[9] Specifically, he has lost one platform: Twitter.  His "combined social media following across all

28  his accounts currently reaches over 3 million people" and he has made "75 national news
appearances in the last year and [a] half."  Id. ¶ 70.

*United States District Court*
*Northern District of California*

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (quoting Twombly, 550 U.S. at 557).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.

Courts should allow a plaintiff leave to amend unless amendment would be futile.  Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246–47 (9th Cir. 1990).

### B.    12(b)(1) Motion to Dismiss

The State defendants and SKDK also move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that O'Handley lacks standing to sue them.  State MTD at 6; SKDK MTD at 3.

"The doctrine of standing limits federal judicial power."  Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1108 (9th Cir. 2003).  The question of whether plaintiffs have standing "precedes, and does not require, analysis of the merits."  Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008).  To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).  Each of these elements must be supported "with the manner and degree of evidence required at the successive stages of the litigation."  Id. at 561.  And plaintiffs "must have standing to seek each form of relief requested in the complaint."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017).

Under Rule 12(b)(1), a defendant may move to dismiss for lack of standing and thus lack of subject matter jurisdiction.  See White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).  Rule 12(b)(1) attacks on standing can be either facial, confining the court's inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint.  Id.; Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  For facial attacks, courts accept the jurisdictional allegations in the complaint as true.  See, e.g., Whisnant v. U.S., 400 F.3d 1177, 1179 (9th Cir. 2005).  When addressing a factual attack, however, courts may consider evidence like declarations submitted by the parties, and the party opposing the motion to dismiss has the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  See, e.g., Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014).

### C.   12(b)(2) Motion to Dismiss

NASS also moves to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, arguing that the Court does not have personal jurisdiction over it.  NASS MTD at 8.

Under Rule 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction.  The plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant.  Cubbage v. Merchent, 744 F.2d 665, 667 (9th Cir. 1984).  In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues.  Data Disc, Inc. v. Systems Tech. Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).  "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995).  A prima facie showing is established if the plaintiff produces admissible evidence which, if believed, would be sufficient to establish personal jurisdiction.  See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clemens Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003).  "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor."  Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010).  But "bare bones assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations

11

will not satisfy a plaintiff's pleading burden." Swartz v. KPMG LLP, 476 F.3d 756, 766 (9th Cir. 2007).

### D.      Anti-SLAPP Motion

Twitter brings a Motion to Strike under California's anti-SLAPP statute.  That law provides that any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is "subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Cal. Code Civ. Proc. § 425.16(b)(1).  The statute facilitates "the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition."  Club Members for an Honest Election v. Sierra Club, 45 Cal. 4th 309 (2008).

## III.   DISCUSSION

This order will discuss each of the pending motions, beginning with Twitter's motions.

### A.      Twitter Motion to Dismiss

Twitter moves to dismiss all of O'Handley's claims against it based on three main arguments: (1) the federal constitutional claims fail because Twitter is not a state actor; (2) the remaining claims fail on the merits; and (3) Twitter's own First Amendment rights are at stake.[10] See generally Twitter MTD.  The Court largely agrees.

#### 1.      State Action

Twitter moves to dismiss the First Amendment claim, the Equal Protection claim, and the Due Process claim against it, arguing that it is not a state actor.  Twitter MTD at 6.  "[T]he First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on State action."  Hudgens v. N.L.R.B., 424 U.S. 507, 519 (1976) (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 567 (1972)).  Put another way, "conduct allegedly causing the deprivation

---

[10] Twitter also argues that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, separately bars O'Handley's claims.  Twitter MTD at 19–21.  The Court does not reach this argument.

United States District Court
Northern District of California

United States District Court
Northern District of California

of a federal right [must] be fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).  That means both that the deprivation must be "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by it or by a person for whom it is responsible" and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Id.  Twitter argues the second prong: that it is not a state actor, but a private company that made independent decisions about O'Handley's account. Twitter MTD at 6.

Twitter is a private entity.  Compl. ¶ 17.  The Ninth Circuit reaffirmed just recently that "a private entity hosting speech on the Internet is not a state actor" subject to constitutional constraints.  See Prager Univ. v. Google LLC, 951 F.3d 991, 995 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a public forum subject to judicial scrutiny under the First Amendment.").[11]  The Supreme Court also recently explained that "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019).  O'Handley knows this.  See Opp'n to State MTD at 4 ("The fact that no social media company has ever been treated as a state actor under § 1983 might be relevant if any plaintiff had ever filed a complaint alleging facts, and documentation to support those allegations, that were remotely like the ones Mr. Handley does here.").

O'Handley argues that Twitter's coordination with the State (and others) in this case transforms what might otherwise be private content-moderation decisions into state action.  Id.; Opp'n to Twitter MTD (dkt. 69) at 3–8 (citing Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2000) ("private behavior" may be treated as state action "if there is such a close nexus between the State and the challenged action that seemingly private

---

[11] O'Handley argued at the motion hearing that Twitter is like the corporate-owned town in Marsh v. Alabama, 326 U.S. 501 (1946), which the Supreme Court held was a state actor.  But the Ninth Circuit rejected that argument in Prager University, noting that the Court has "unequivocally confined Marsh's holding to the unique and rare context of 'company town[s]' and other situations where the private actor 'perform[s] the full spectrum of municipal powers.'" Id. at 998 (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 569 (1972); Hudgens, 424 U.S. at 518–20).

behavior may be fairly treated as that of the State itself.") (cleaned up)).  At the motion hearing, he characterized this case as a "very different scenario" due to an unprecedented degree of "interconnectedness" between Twitter and the State.

"The United States Supreme Court has articulated four different factors or tests to determine state action."  Gorenc v. Salt River Project Agr. Imp. & Power Dist., 869 F.2d 503, 506 (9th Cir. 1989) (citing Lugar, 457 U.S. at 939); Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1140 (9th Cir. 2012).  These are the nexus test, the joint action test, the public function doctrine, and the state compulsion test.  Gorenc, 869 F.2d at 506–09.  O'Handley argues that the joint action test applies.  See Opp'n to Twitter MTD at 48; Compl. ¶ 110 ("Defendants . . . willfully and cooperatively participated in the government Defendants' efforts to censor"), ¶ 112 ("Defendants . . . took action, jointly . . . against Mr. O'Handley").

The joint action test asks "whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity."  Gorenc, 869 F.2d at 507 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)).  "[A] bare allegation of such joint action will not overcome a motion to dismiss."  DeGrassi v. City of Glendora, 207 F.3d 636, 647 (9th Cir. 2000).  The Supreme Court has explained:

> [A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.  Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives.

Blum v. Yaretsky, 457 U.S. 991, 1004–05 (1982).  And this circuit has required "substantial cooperation" or that the private entity's and government's actions be "inextricably intertwined." Brunette v. Humane Society of Ventura Cnty., 294 F.3d 1205, 1211 (9th Cir. 2002).  "A conspiracy between the State and a private party to violate constitutional rights may also satisfy the joint action test."  Id.  However, the private and government actors must have actually agreed to "violate constitutional rights."  Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983).

The allegations here fall short of plausibly alleging joint action.

### a.    November 2020 Message to Twitter

Despite O'Handley's assertions at the motion hearing about unprecedented "interconnectedness" and "back-and-forth" communications, the Complaint alleges that an unidentified OEC official sent <u>a single message to Twitter, flagging a single O'Handley tweet</u>. <u>See</u> Compl. ¶¶ 28–29, 32–33, 76–78.  That is the central act in the Complaint.  OEC's message did not direct or even request that Twitter take any particular action in response to the tweet.  <u>See id.</u> ¶ 76, Ex. 9.  This single message occurred in November 2020.  <u>Id.</u> ¶ 76.  The Complaint does not allege that there was any further communication between Twitter and the government about that tweet, or about any other O'Handley tweets—including the February 2021 tweet that prompted Twitter to permanently suspend O'Handley's account for violating its Civic Integrity Policy.  <u>See id.</u> ¶ 88; <u>see also id.</u> ¶ 81 (arguing instead: "Prior to OEC requesting Twitter censor the [first] Post, Twitter had never before suspended Mr. O'Handley's account or given him any strikes.  He suddenly became a target of Twitter's speech police, at the behest of Defendants.").

One party supplying information to another party does not amount to joint action.  <u>See</u> <u>Lockhead v. Weinstein</u>, 24 Fed. App'x 805, 806 (9th Cir. 2001) ("[M]ere furnishing of information to police officers does not constitute joint action"); <u>Fed. Agency of News LLC v. Facebook, Inc.</u>, 432 F. Supp. 3d 1107, 1124 (N.D. Cal. 2020) ("supplying information to the state alone [does not amount] to conspiracy or joint action") (alteration added); <u>Deeths v. Lucile Slater Packard Children's Hospital at Stanford</u>, No. 1:12-cv-02096-LJO, 2013 WL 6185175, at *8, 9 (E.D. Cal. Nov. 26, 2013) ("Even if Dr. Stirling made false statements to Kern County social workers regarding the need to remove R.D. from Plaintiff's care, supplying information alone does not amount to conspiracy or joint action under color of state law.").[12]

Moreover, the one-off, one-way communication here does not reflect "substantial cooperation."  <u>See</u> <u>Brunette</u>, 294 F.3d at 1212.  Nor does it reflect that the State of California "exercised coercive power" over Twitter's decisions to progressively discipline and ultimately suspend O'Handley, such that those decisions "must in law be deemed to be that of the State."

---

[12] O'Handley accurately notes that these cases all involve a private party giving information to the government and not the other way around.  <u>See</u> Opp'n to Twitter MTD at 6–7.  But he does not point to any authority holding that the distinction makes a difference.

United States District Court
Northern District of California

See Blum, 457 U.S. at 1004–05.  O'Handley's reference to Desert Palace at the motion hearing only illustrates how meager the allegations here are.  In Desert Palace, the government "train[ed casino] security guards, provid[ed] information from the records department, and delegate[ed to the casino's security guards] the authority to issue citations," thereby "insinuat[ing] itself into a position of interdependence with [the casino]."  698 F.3d at 1140 (internal quotation marks omitted).  Here, OEC on a single occasion alerted Twitter to a single O'Handley tweet.  See Compl. Ex. 9 ("Hi, We wanted to flag this Twitter post. . . .").  The State did not delegate to Twitter any "authority, normally reserved to the state."  See Desert Palace, 698 F.3d at 1140.  Nor, in its single email sending Twitter information, did the State "exert[] control over how [Twitter] used the information [it] obtained."  See Deeths, 2013 WL 6185175, at *10.  While the State might have approved of how Twitter acted in response to O'Handley's tweet—and it might just as well not have—mere approval or acquiescence does not make the State responsible for Twitter's actions.  See Blum, 457 U.S at 1004–05.[13]

### b.      Working Together and the Portal

O'Handley argues, though, that there is more involved than the single November 2020 message from OEC to Twitter about his tweet.  He points to OEC and Twitter's broader efforts on election misinformation, and he quotes from OEC's alleged statements about "working closely with social media companies" as evidence of how intertwined Twitter was with the government.  Opp'n to Twitter MTD  at 5 (citing Compl. Ex. 2).  At the motion hearing, O'Handley asserted that the State said in its "own words" that it partnered with Twitter "to take down speech," which was inaccurate; the Complaint instead includes an alleged OEC statement that "We worked closely and proactively with social media companies to  . . . take down sources of misinformation. . . ."  See Compl. Ex. 1.  O'Handley further argues that Twitter created the Portal to allow OEC's "censorship reports" to be "bumped to the head of the queue."  Opp'n to Twitter MTD at 5 (citing Compl. Ex. 3).

---

[13] Nor do the Complaint's conclusory allegations of joint action bolster O'Handley's case.  See Compl. ¶¶ 108–10; Dietrich v. John Asuaga's Nugget, 548 F.3d 892, 900 (9th Cir. 2008) (bare allegation that defendants acted in concert "insufficient to establish joint action").

United States District Court
Northern District of California

Generalized statements about working together do not demonstrate joint action.  See Children's Health Def. v. Facebook, Inc., No. 20-cv-05787-SI, 2021 WL 2662064, at *10–11 (N.D. Cal. June 29, 2021).  In addition, the government can work with a private entity without converting the private entity's decisions into government decisions.  In Mathis v. Pacific Gas Company, 75 F.3d 498, 501 (9th Cir. 1996), where PG&E conducted an undercover operation in close partnership with the county narcotics Task Force, the plaintiff argued that PG&E's "later decision to exclude him from the plant was attributable to the Task Force as part of a 'joint action,' exposing PG&E to liability under 42 U.S.C. § 1983."  The Ninth Circuit explained that "the specific action [the plaintiff challenged] is the procedure by which PG&E decided to exclude him from its plant," and that while "PG&E conducted its investigation in close cooperation with the Task Force," his "challenge is limited to PG&E's decision-making process after the investigation was completed."  Id. at 504.  The plaintiff argued that "without an investigation, he wouldn't have been excluded."  Id.  But the Ninth Circuit found it significant that "the Task Force wasn't involved in the decision to exclude [the plaintiff] from the plant. Whether or not its previous acts facilitated the decision, the mantle of its authority didn't." Id. (emphasis added).  Because PG&E had independently decided to exclude the plaintiff, there was no joint action and no 1983 liability for PG&E.  Id.

In Mathis, general "consultation and information sharing" in advance of the challenged decision were not enough for joint action.  Id.  Here, Twitter created a Portal and informed the state about it through NASS, see Compl. Exs. 2, 3, and the state may have used the Portal to report election misinformation on Twitter's platform, see id. ¶ 32.  There was no consultation and very little information sharing about O'Handley.  See Compl. Ex. 9.  Arguably, "without" OEC flagging O'Handley's tweet to Twitter, O'Handley "wouldn't have" had his first tweet labeled.  See Mathis, 75 F.3d at 504.[14]  O'Handley indeed suggests this.  See Compl. ¶ 81 ("Prior to OEC requesting Twitter censor the [first] Post, Twitter had never before suspended Mr. O'Handley's account. . . .").  But there is no evidence or even allegation that the government played any role in

---

[14] On the other hand, someone else could have reported the tweet to Twitter.

United States District Court
Northern District of California

Twitter's "internal . . . decisions," see Mathis, 75 F.3d at 504, to label O'Handley's tweets, or to add strikes to and ultimately suspend O'Handley's account.

O'Handley disputes the notion that Twitter "always acted independently, only 'sometimes' acquiescing to the OEC's censorship requests." Opp'n to Twitter MTD at 5. He emphasizes OEC's alleged claim that Facebook and Twitter "promptly removed" 98% of erroneous or misleading posts. Id. (citing Compl. ¶ 64). And he suggests that this high number reveals that Twitter "understood its role" as government censor. Id. at 6. The 98% number is of somewhat limited value, as it represents both Facebook and Twitter posts. See Compl. ¶ 64. It is also of limited value because O'Handley does not actually allege that the "misinformation" identified by OEC was not really misinformation. He suggests that his own tweets were not misinformation, see id. ¶ 74 (incorrectly characterizing his tweet that "Election fraud is rampant nationwide and we all know California is one of the culprits" as "personal opinion"), but does not squarely address the other "misinformation" identified by OEC. The 98% number is also in conflict with the OEC spreadsheet attached to the Complaint, which shows that Twitter took no action on OEC-reported content in about one-third of the instances of alleged misinformation listed. See id. Ex. 9.

Regardless of the percentage of flagged tweets that Twitter ultimately removed, there is ample evidence that it was Twitter who decided whether to remove them. The spreadsheet reflects that when Twitter responded to OEC about its reports, it described its decision of whether to remove a post, or take no action on it, by referencing its own interpretation of its own Rules. See, e.g., id. ("After our review, we've locked the account for breaking our rules regarding civic integrity"; "We're writing to let you know that after a review, we didn't find a violation of our civic integrity policy in the content you reported."). This is consistent with Twitter's characterization of the Portal as a tool for people interested in promoting civic processes "to flag concerns directly to Twitter," including "technical issues . . . and content on the platform that . . . may violate our policies." See Compl. Ex. 2 (emphasis added). The spreadsheet does not show, and the Complaint does not allege, that Twitter consulted or conferred with the government on content decisions. See Compl. Ex. 9. Twitter's Terms of Service gave it unlimited authority to remove or discipline accounts, see Twitter Terms of Service, and Twitter referenced its own

policies when it exercised that authority, see Compl. ¶ 88 ("Your account, DC_Draino has been suspended for violating the Twitter Rules. Specifically, for: Violating our rules about election integrity.").

The allegations about working together and the Portal therefore do not demonstrate joint action.

### c.   Conspiracy

Finally, there is no support for O'Handley's assertion that Twitter was a willful participant in "an agreement or meeting of the minds to violate constitutional rights." See Opp'n to Twitter MTD at 5. Participants in a conspiracy need not know the exact details of the plan, so long as they share the general conspiratorial objective. Fonda, 707 F.2d at 438; Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002). Whether an unlawful conspiracy exists is "generally" an issue for the jury, "so long as . . . the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." Mendocino Env'tl Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1301–02 (9th Cir. 1999) (internal marks and citation omitted). A jury can infer an agreement if "alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement.'" Id. (citation omitted).

Here, though, the only allegations that O'Handley points to in support of a conspiracy are the allegations that OEC "work[ed] closely with social media companies to be proactive so when there's a source of misinformation, we can contain it." See Opp'n to Twitter MTD at 5 (quoting Compl. ¶¶ 24–25, Ex. 2); see also Opp'n to State MTD at 4 (referencing, incorrectly, a "myriad of direct communications demonstrating extensive coordination").[15] Such allegations might demonstrate a meeting of the minds to promptly address election misinformation, but not a

---

[15] He also points to an email exchange between OEC and Twitter in which OEC emailed Twitter on December 30, 2019 asking that a tweet by an entirely different Twitter account be taken down, to which Twitter responded the following morning that it had removed the tweet. Id. (citing Compl. ¶ 35). That tweet allegedly shared "a doctored image of a California Registration Card (inaccurately claiming that the Republican Party is not an option)," see Comp. ¶ 34, and so its prompt removal is not evidence of wrongdoing or an action unlikely to have been taken without an agreement to violate rights.

United States District Court
Northern District of California

meeting of the minds to "violate constitutional rights," let alone O'Handley's constitutional rights. See Fonda, 707 F.2d at 438; see also Children's Health Def., 2021 WL 2662064, at *11 (general statements about working together "do[] not support the inference that Facebook (or Zuckerberg) worked in concert with the CDC to censor CHD's speech, retaliate against CHD, or otherwise violate CHD's constitutional rights."). Nor does the Court find generalized statements about working together to counteract the dissemination of election misinformation particularly nefarious—such statements do not support an inference of an illegal conspiracy.

The Complaint makes a single conclusory allegation that Twitter's "real reasons for suspending Mr. O'Handley do not stem from a violation of Twitter's terms of service, but from the content of his speech raising concerns about election administration and integrity, specifically concerns related to the work of then-California Secretary of State Alex Padilla." Compl. ¶ 99. There is no support for this allegation. There is no basis in the Complaint for a jury to infer that Twitter agreed with the government to retaliate against O'Handley because of his criticism of Padilla.

Far from it being "unlikely" for Twitter to have acted the way it did "without an agreement," see Mendocino Env'tl Ctr., 192 F.3d at 1301, the Complaint reflects that Twitter routinely took the enforcement actions it did based on violations of its Civic Integrity Policy. See, e.g., Compl. Ex. 2 (Portal is a way to "to flag concerns directly to Twitter," including "technical issues . . . and content on the platform that . . . may violate our policies."); Compl. Ex. 9 ("After our review, we've locked the account for breaking our rules regarding civic integrity"; "We're writing to let you know that after a review, we didn't find a violation of our civic integrity policy in the content you reported."); Compl. ¶ 88 ("Your account, DC_Draino has been suspended for violating the Twitter Rules. Specifically, for: Violating our rules about election integrity.").

OEC's lone message to Twitter did not state that Twitter should remove (or do anything with) O'Handley's tweet because it criticized Padilla. See Compl. ¶ 76, Ex. 9 (asserting that O'Handley's tweet "is a blatant disregard to how our voting process works and creates disinformation and distrust among the general public"). Moreover, none of the other O'Handley tweets at issue in this case even referred to Padilla, California, or the OEC. All referred to the

1    2020 Presidential Election in national terms.  See id. ¶¶ 84–87.  It is simply not plausible that

2    Twitter shared a conspiratorial objective with the OEC to retaliate against O'Handley for

3    criticizing Padilla.

4            O'Handley has therefore failed to plausibly allege that Twitter was a state actor by virtue

5    of the joint action test.  Because Twitter was not a state actor, it cannot be liable under § 1983, and

6    the Court DISMISSES the First Amendment, Equal Protection, and Due Process Claims against

7    Twitter.

8                            **2.      Remaining Claims**

9            Twitter next moves to dismiss the two remaining claims against it on the merits.  See

10   Twitter MTD at 14.

11                            **a.      Section 1985**

12           The elements of conspiracy under 42 U.S.C. § 1985(3) are (1) a conspiracy; (2) "for the

13   purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of

14   equal privileges and immunities under the laws"; (3) an "act in furtherance" of the conspiracy; and

15   (4) an injury or deprivation of rights.  Life Ins. Co. of N. Am. v. Reichardt, 591 F.2d 499, 502 (9th

16   Cir. 1979) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102–03 (1971)).  Because "the purpose[]

17   of the Ku Klux Klan Act . . .[is] only to protect against deprivations of equal protection,"

18   Hickman v. Block, 81 F.3d 168 (9th Cir. 1996), a plaintiff must also show "[5] some racial, or

19   perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators'

20   action" and [6] that the conspiracy "aimed at interfering with rights" that are "protected against

21   private, as well as official, encroachment," Bray v. Alexandria Women's Health Clinic, 506 U.S.

22   263, 267–68 (1993).  "A mere allegation of conspiracy without factual specificity is insufficient to

23   support a claim."  Sanchez v. City of Santa Ana, 936 F.2d 1027, 1039 (9th Cir. 1990).

24           Twitter moves to dismiss the section 1985 claim, arguing that O'Handley fails to plausibly

25   allege the first, third, and fifth elements.  Twitter MTD at 15.  The Court agrees that O'Handley

26   fails to plausibly allege a conspiracy to deprive anyone "of the equal protection of the laws, or of

27   equal privileges and immunities under the laws."  See Life Ins. Co. of N. Am., 591 F.2d at 502.

28           As discussed above in connection with the joint action test, O'Handley fails to plausibly

United States District Court
Northern District of California

allege a conspiracy between the defendants—whether that conspiracy is framed as one to "violate the constitutional rights of individuals who questioned election processes and outcomes—or in Defendants' words, spread 'misinformation,'" see Compl. ¶ 168, "to seek out and swiftly censor speech with which they disagreed," see id. ¶ 169, "to jointly deprive Mr. O'Handley of his rights," see id. ¶ 170, or "to censor speech which they found objectionable or 'misleading,'" see id. ¶ 171. There are allegations that support the notion that the defendants collaborated to counteract election misinformation generally.  See id. ¶¶ 24–25, Ex. 2.  And there are allegations that an unnamed OEC official communicated with Twitter one time to alert Twitter to O'Handley's first tweet.  See id. ¶ 76, Comp. Ex. 9. But these allegations do not support any of the conspiracies alleged in this claim, particularly given the evidence discussed above that Twitter made content decisions based on its own application of its own Rules.  Nor do the Complaint's conclusory allegations of conspiracy aid O'Handley in stating a claim.  See Compl. ¶ 99 (re Twitter's "real reasons for suspending Mr. O'Handley").

Because the Complaint fails to plausibly allege a conspiracy to deprive O'Handley of his rights, the Court DISMISSES the section 1985 claim against Twitter.

### b.  California Constitution (Free Speech Clause)

Twitter argues that "[l]ike his federal constitutional claims, Plaintiff's claim under the free speech cause of the California Constitution must be dismissed because Twitter is a private entity, not a state actor."  Twitter MTD at 16.  Having dismissed the federal claims against Twitter, the Court declines to exercise supplemental jurisdiction over the California Constitution (Free Speech Clause) claim.  See 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction); Oliver v. Ralphs Grocery Co., 654 F.3d 903, 911 (9th Cir. 2011) (not error to decline supplemental jurisdiction where "balance of the factors of 'judicial economy, convenience, fairness, and comity' did not 'tip in favor of retaining the state-law claims' after dismissal of the [federal] claim"); Acri v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th Cir. 1997) ("[S]tate law claims 'should' be dismissed if federal claims are dismissed before trial") (emphasis in original).  That claim involves novel issues that are best addressed, in the first instance, by the state court.

1

2

3

### 3.     Twitter's First Amendment Rights

Twitter finally argues that its own First Amendment rights are at stake in this lawsuit.

Twitter MTD at 18–19.  O'Handley has argued that his case stems from "Twitter's <u>retaliatory</u>

<u>strikes and [the] eventual removal</u> of Mr. O'Handley from its platform,"[16] and so "simply does not

require, nor do the factual allegations rest on, Twitter engaging in expressive activity of any sort."

Opp'n to Twitter Anti-SLAPP (dkt. 70) at 6 (emphasis in original).  To be clear, the Complaint

repeatedly objects to Twitter having "appended commentary [to his tweets] asserting that [his]

claim about election fraud was disputed."  <u>See</u> Compl. ¶ 77; <u>see also</u> <u>id.</u> ¶ 86.  Indeed, in other

briefs, O'Handley argues that Twitter "retaliated against Mr. O'Handley . . . by appending a public

label" to his tweets.  <u>See</u> Opp'n to State MTD at 2; Opp'n to SKDK MTD (dkt. 66) at 2 ("Twitter

punished Mr. O'Handley for criticizing a California state official . . . by appending commentary

asserting that Mr. O'Handley's tweet was false").  His case against Twitter is therefore based on

Twitter appending labels to his tweets for allegedly violating Twitter's Civic Integrity Policy, its

imposition of strikes on his account, its limitation on the reach of his tweets, and its ultimate

removal of his account from the platform.  Those acts are all interrelated.

Moreover, those acts are expressive.  "The choice of material to go into a newspaper, and

the decisions made as to limitations on the size and content of the paper, and treatment of public

issues and public officials—whether fair or unfair—constitute the exercise of editorial control and

judgment" and are protected by the First Amendment.  <u>See</u> <u>Miami Herald Pub. Co. v. Tornillo</u>,

418 U.S. 241, 257–58 (1974); <u>see also</u> <u>Associates & Aldrich Co. v. Times Mirror Co.</u>, 440 F.2d

133, 135 (9th Cir. 1971) ("Appellant has not convinced us that the courts . . . should dictate the

contents of a newspaper."); <u>cf.</u> <u>Pacific Gas & Elec. Co. v. Public Utilities Com'n of California</u>,

475 U.S. 1, 4 (1986) (government cannot force PG&E to include in billing statements speech of

third party with which PG&E disagreed).  Likewise, "where . . . an action directly targets the way

a content provider chooses to deliver, present, or publish news content on matters of public

interest, that action is based on conduct in furtherance of free speech rights."  <u>Greater L.A. Agency</u>

<u>on Deafness, Inc. v. Cable News Network, Inc.</u>, 742 F.3d 414, 424–25 (9th Cir. 2014).

---

[16] He also argued at the motion hearing that Twitter's conduct limited the reach of his tweets.

Like a newspaper or a news network, Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment.  See NetChoice, LLC v. Paxton, No. 1:21-cv-840-RP, 2021 WL 5755120, at *7 (W.D. Tex. Dec. 1, 2021) ("Social media platforms have a First Amendment right to moderate content disseminated on their platforms."); Isaac v. Twitter, Inc., No. 21-cv-20684-BLOOM/Otazo-Reyes, 2021 WL 3860654, at *6 (S.D. Fla. Aug. 30, 2021) (Twitter "has a First Amendment right to decide what to publish and what not to publish on its platform") (internal quotation marks and citation omitted); Cross v. Facebook, Inc., 14 Cal. App. 5th 190, 202 (2017) ("source of . . . alleged injuries . . . is the content of the pages and Facebook's decision not to remove them, an act 'in furtherance of the . . . right of petition or free speech'"); La'Tiejira v. Facebook, Inc., 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (acknowledging "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); Publius v. Boyer-Vine, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) (owner of website has "First Amendment right to distribute and facilitate protected speech on the site"); Zhang v. Baidu.com Inc., 10 F. Supp. 3d 433, 437–43 (S.D.N.Y. 2014) (holding that suit "to hold [website] liable for . . . a conscious decision to design its search-engine algorithms to favor certain expression on core political subjects over other expression on those same political subjects" would "violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."); Kronemyer v. Internet Movie Database, Inc., 150 Cal. App. 4th 941, 946–47 (2007) ("[L]isting of credits on respondent's Web site is an act in furtherance of the right of free speech. . . .").  Indeed, the Supreme Court recently cautioned against treating a defendant as a state actor, even though it was regulated by the State and provided a forum for speech, because doing so could "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms."  Manhattan Community Access Corp., 139 S. Ct. at 1932.

The Court therefore rejects O'Handley's argument that this case is analogous to Rumsfeld v. Forum for Acad. & Institutional Rts., Inc. ("FAIR"), 547 U.S. 47, 48 (2006), which involved a law requiring law schools to provide equal access on campus to military recruiters.  See Opp'n to

Twitter Anti-SLAPP at 7.  The Court held that that law did not violate the law schools' freedom of speech because "[u]nlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive." <u>FAIR</u>, 547 U.S. at 64. O'Handley contends that banning someone from a social media platform, or issuing a strike against his account, is like allowing military recruiters on campus—not a form of speech.  Opp'n to Twitter Anti-SLAPP at 7.  But unlike an entity that organizes itself for non-expressive purposes, Twitter is "the primary social channel for political commentary and news in American society at present." <u>See</u> Compl. ¶ 90.  As O'Handley commented at the motion hearing, "on Twitter, all there is is discussion of issues."  Twitter's decisions to include, exclude, or label a tweet on a site that is entirely a "discussion of issues" are expressive.  As Twitter explained, it "expressed its negative opinions about the content of O'Handley's tweets by labeling them as disputed and/or likely to cause violence," and it expressed its "view that O'Handley's particular tweets were not appropriate for sharing on its platform" by suspending O'Handley's account.  Reply re Twitter Anti-SLAPP (dkt. 80) at 1; <u>see also</u> <u>Kronemyer</u>, 150 Cal. App. 4th at 947 ("It is, of course, well established that the constitutional right of free speech includes the right not to speak.").  These decisions operated "together with numerous decisions regarding other tweets and users to more broadly shape and develop the nature, tone, and substance of the ongoing dialogue that Twitter seeks to foster and present on its platform."  Reply re Twitter Anti-SLAPP at 1.  That is expression.

O'Handley disagrees, arguing at the motion hearing that no one would think that O'Handley's tweets were Twitter's speech, and that Twitter could simply have used its own Twitter account to express its disagreement with O'Handley.  But a Twitter user encountering O'Handley's tweets would indeed think that Twitter is the kind of place that allows such tweets on its platform.  A user who encountered enough such tweets might think that Twitter was content to be complicit in spreading election misinformation.  This is because a platform's decision to publish or not publish particular tweets says something about what that platform represents.[17]  <u>See</u>

---

[17] The Court thus finds <u>Turner Broadcasting System, Inc. v. F.C.C.</u>, 512 U.S. 622, 655–56 (1994), which involved provisions requiring cable operators to carry local broadcast stations,

United States District Court
Northern District of California

1    NetChoice, LLC, 2021 WL 5755120, at *8 ("This Court is convinced that social media platforms .

2    . . curate both users and content to convey a message about the type of community the platform

3    seeks to foster and, as such, exercise editorial discretion over their platform's content.").  The

4    notion that Twitter should be powerless to do anything but post its own tweets responding to every

5    tweet on its platform that spreads misinformation makes very little sense from either a legal or

6    practical perspective.

7          Additionally, as the court noted in Zhang, 10 F. Supp. 3d at 441, O'Handley's assertion

8    that Twitter's challenged conduct is not expressive "is belied by [O'Handley's] own theory of the

9    case, which is that by exercising editorial discretion, [Twitter] favors some 'political speech' over

10   other 'political speech,'" see, e.g., Compl. ¶¶ 4 ("Defendants' exercise of government force to

11   censor political speech with which they disagree"), 83 (commentators who supported Democrats

12   were not censored while conservative commentators were).  See also NetChoice, LLC, 2021 WL

13   5755120, at *8 ("Without editorial discretion, social media platforms could not skew their

14   platforms ideologically, as the State accuses [] them of doing.").

15         Twitter has important First Amendment rights that would be jeopardized by a Court order

16   telling Twitter what content-moderation policies to adopt and how to enforce those policies.  The

17   Court will issue no such order.  For the foregoing reasons, Twitter prevails on its motion to

18   dismiss all of the claims against it, save and except for the California Constitution (Free Speech

19   Clause) claim, over which this Court declines to exercise jurisdiction.

20         **B.    Twitter Anti-SLAPP Motion**

21         Twitter has also filed an anti-SLAPP motion against O'Handley in connection with the

22   California Constitution (Free Speech Clause) claim only.[18]  Twitter Anti-SLAPP.  Analysis of a

23   motion to strike pursuant to the anti-SLAPP statute consists of two steps.  The defendant must first

24   show that the statute applies because the defendant was "engaged in conduct (1) in furtherance of

25   _____

26   distinguishable.  The Court there noted that "Given cable's long history of serving as a conduit for
     broadcast signals, there appears little risk that cable viewers would assume that the broadcast
27   stations carried on a cable system convey ideas or messages endorsed by the cable operator."
     Turner Broadcasting System, Inc., 512 U.S. at 655.  Not so here.

28   [18] "The anti-SLAPP statute does not apply to federal law causes of action."  Doe v. Gangland
     Prods., Inc., 730 F.3d 946, 955 n. 3 (9th Cir. 2013).

United States District Court
Northern District of California

the right of free speech; and (2) in connection with an issue of public interest." See Doe, 730 F.3d at 953. If the defendant makes the requisite showing, the court then considers whether the plaintiff has demonstrated "a reasonable probability" of prevailing on the merits of his claims. In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268, 1273 (9th Cir. 2013) (quoting Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003)).

Because the Court does not exercise supplemental jurisdiction over the California Constitution (Free Speech Clause) claim, the Court cannot rule on whether O'Handley has demonstrated a reasonable probability of prevailing on the merits of that claim. Accordingly, the Court does not reach the anti-SLAPP motion.

### C.    State Defendants Motion to Dismiss

The State defendants move to dismiss all of O'Handley's claims against them, for five reasons: (1) the Complaint fails to establish O'Handley's standing; (2) the Complaint fails to establish liability under section 1983; (3) the Complaint fails to state a claim as to each cause of action; (4) qualified immunity bars all claims against the individual defendants; and (5) Eleventh Amendment immunity bars the California Constitutional claim, and any claim for damages, against Secretary Weber. See generally State MTD.[19] The State defendants prevail.

#### 1.    Standing

The State defendants argue first that the Complaint fails to establish standing over them because it does not establish that they took any action that is fairly traceable to the suspension of O'Handley's Twitter account. State MTD at 7–8 (citing Lujan, 504 U.S. at 560–61). Traceability is one of the requirements for standing. See Lujan, 504 U.S. at 560–61.

The State defendants assert that the only conduct the Complaint actually attributes to Dresner, Jones, Mahood and Valle is receiving the Misinformation Daily Briefing email from SKDK that highlighted election-related news and social media posts, including O'Handley's "[a]udit every California ballot" post. See Compl. ¶ 74 & Ex. 6. But the State receiving an email

---

[19] The Court declines to exercise supplemental jurisdiction over the California Constitution (Free Speech Clause) claim, but notes that O'Handley fails to dispute the State defendants' Eleventh Amendment argument. See generally Opp'n to State MTD; Reply re State MTD (dkt. 78) at 15. This order addresses only the four disputed arguments.

did not harm O'Handley.  The non-conclusory allegations about Padilla are that he authorized the State's contract with SKDK.  See Compl. ¶¶ 37–56.  But the alleged improper granting of a state contract to an outside contractor did not harm O'Handley.

The central allegation in the Complaint is that an unidentified agent or staff member—not even, necessarily, one of the individual State defendants—flagged the O'Handley tweet identified in the Misinformation Daily Briefing in an email to Twitter.  See id. ¶¶ 76, 77, Ex. 9.  The State defendants argue that O'Handley cannot trace his injury—the permanent suspension of his Twitter account—back to this event: "reporting the post to Twitter, by itself, could not cause any alleged injury to plaintiff, as Twitter alone had the power to determine to label the post as disputed and apply a strike to plaintiff's account."  State MTD at 7 (citing the Civic Integrity Policy).  And again, the State email to Twitter involved just one O'Handley tweet; there is no allegation that the State had any contact with Twitter about any of O'Handley's subsequent tweets, including the final one, which prompted the suspension of his account.  Nor is there any allegation that the State was involved in any of Twitter's content moderation decisions.

O'Handley argues that "a defendant need not be the injury's 'sole source' or 'proximate cause' as long as the link is 'not tenuous or abstract.'"  Opp'n to State MTD at 3 (quoting Barnum Timber Co v. EPA, 633 F.3d 894, 901 (9th Cir. 2011); Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 860 (9th Cir. 2005)).  That is correct.  See Maya v. Centex Corp., 658 F.3d 1060, 1070 (9th Cir. 2011) ("A causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.") (cleaned up).  In Barnum Timber, the Ninth Circuit held that the plaintiff's injury—a reduction in property value— was fairly traceable to the EPA's decision to deem the creek that the property was on an impaired water body; the plaintiff had submitted declarations explaining that the EPA's decision would make the property appear to be subject to "additional and onerous regulation."  633 F.3d at 898– 99.  The link there was not particularly tenuous, and the plaintiff had "more than met its burden . . . at the pleading stage."  Id. at 899.  Similarly, in Ocean Advocates, the Ninth Circuit held that the plaintiff's harm—increased tanker traffic and the risk of an oil spill—was traceable to the planned extension of an oil tanker dock.  402 F.3d at 860.  The court explained that while "[t]he causal

connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties," "the link [between the action and the harms was] not tenuous or abstract." Id.

In Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41 (1976), the Supreme Court found the link too tenuous. The plaintiffs there had been denied hospital services, and brought suit against the government, alleging that by adopting a revenue ruling allowing favorable tax treatment to hospitals that offered only emergency room services to indigents, the government had encouraged the hospitals to deny services to indigents. Id. at 41. The Court held that the plaintiffs had no standing against the government, as it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to [the government's] 'encouragement or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 42.

As in Simon, the link here is tenuous. The Court would have to conclude that Twitter's decision to suspend O'Handley's account for violating its Civic Integrity Policy stemmed from the State's flagging of a single O'Handley's post three months earlier, rather than from Twitter's application of its own Rules. But, as discussed above, Twitter described its decision of whether to remove a post, or take no action on it, by referencing its own interpretation of its own Rules. See, e.g., Compl. Ex. 9 ("After our review, we've locked the account for breaking our rules regarding civic integrity"; "We're writing to let you know that after a review, we didn't find a violation of our civic integrity policy in the content you reported."). Twitter characterized the Portal as a tool "to flag concerns directly to Twitter," including "technical issues . . . and content on the platform that . . . may violate our policies." See Compl. Ex. 2 (emphasis added). Twitter's Terms of Service gave it unlimited authority to remove or discipline accounts, see Twitter Terms of Service, and Twitter referenced its own policies when it exercised that authority, see Compl. ¶ 88 ("Your account, DC_Draino has been suspended for violating the Twitter Rules. Specifically, for: Violating our rules about election integrity.").

"In cases where a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' injuries," the causal chain is "too

29

weak to support standing." See Maya, 658 F.3d at 1070 (citation omitted); see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 (2013) (expressing reluctance about allegations that "rest on speculation about the decisions of independent actors"); Ass'n of Am. Physicians & Surgeons v. U.S. FDA, 13 F.4th 531, 546 (6th Cir. 2021) (collecting cases holding "that a plaintiff failed to establish that an injury was traceable to a defendant when the injury would arise only if some third party decided to take the action triggering the injury."). Here, the causal chain alleged in the Complaint is the State improperly installing SKDK, SKDK flagging O'Handley's tweet to the State, the State flagging O'Handley's tweet to Twitter, O'Handley tweeting several more times, Twitter applying several more labels and strikes over the course of multiple months, and then Twitter suspending O'Handley's account. See Compl. ¶¶ 19–88. That chain involves "numerous third parties" making "independent decisions," culminating in Twitter making the decision to suspend O'Handley's account.

O'Handley's response is again to cry conspiracy: Twitter used the Portal to "streamline state censorship submissions for priority actions"; the State's use of the Portal was an instruction to Twitter to "take down" the flagged tweets; and, "[a]cting as the arm of the OEC," Twitter complied with the State's censorship requests 98% of the time. Opp'n to State MTD at 3. He argues: "These were not 'independent decisions,' but coordinated steps taken in furtherance of a conspiracy." Id. Because, as discussed above, the conspiracy allegations are not plausible— particularly as to the purpose of the defendants' work together—they do not save O'Handley's standing.

Standing allegations "need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits." See Ocean Advocates, 402 F.3d at 860. Even so, given the tenuous causal chain alleged, the Court DISMISSES the claims against the State defendants for lack of standing.[20]

### 2.   State Action

The State defendants next argue that the claims brought under section 1983 all fail because

---

[20] The Court's ruling does not pertain to the California Constitution (Free Speech Clause) claim, over which the Court declines to exercise supplemental jurisdiction.

1    they are not "fairly attributable to" the State.  See State MTD at 8 (quoting Pasadena Republican

2    Club v. W. Just. Ctr., 985 F.3d 1161, 1167 (9th Cir. 2021)).  O'Handley responds that Twitter is a

3    state actor by virtue of the joint action and nexus tests.  Opp'n to State MTD at 3–5.

4         As discussed above in connection with Twitter's motion to dismiss, the Complaint does

5    not satisfy the joint action test.  The nexus test "asks 'whether there is a sufficiently close nexus

6    between the State and the challenged action of the regulated entity so the action of the latter may

7    be fairly treated as that of the state itself.'"  Gorenc, 869 F.2d at 506 (citing Jackson v.

8    Metropolitan Edison Co., 419 U.S. 345, 351 (1974)); see also Villegas v. Gilroy Garlic Festival

9    Ass'n, 541 F.3d 950, 955 (9th Cir. 2008) (listing factors to consider for nexus test, including

10   whether state officials dominate decision-making of organization and whether organization's

11   funds largely come from state).  For the same reasons the Complaint does not meet the joint action

12   test, it also does not meet the nexus test.

13        Because Twitter's actions are not attributable to the State, the Court DISMISSES the First

14   Amendment, Equal Protection, and Due Process[21] claims against the State.

15              **3.       Failure to State a Claim**

16        The State defendants next argue that the Complaint fails to state a claim as to each cause of

17   action.  See State MTD at 10–15.  The Court need not reach most of these arguments.  As

18   discussed above in connection with Twitter's motion, the Court also DISMISSES the section 1985

19   conspiracy claim for failure to state a claim, and declines to exercise supplemental jurisdiction

20   over the California Constitution (Free Speech Clause) claim.

21        That leaves the claim that O'Handley brings against the State defendants only, alleging

22   that California Elections Code § 10.5 violates the Due Process Clause because it "is impermissibly

23   vague because it fails to provide a reasonable opportunity to know what conduct is prohibited or is

24   so indefinite as to allow arbitrary and discriminatory enforcement."  Compl. ¶ 162.  A statute can

25   be void for vagueness where it "fails to provide a person of ordinary intelligence fair notice of

26

27   _____

28   [21] This refers to the fourth claim for relief, which alleges that the defendants "cause[d] Twitter to inflict the constitutional injury of depriving Plaintiff of his occupation and taking the business goodwill he had garnered through his Twitter account."  See Compl. ¶ 152.

United States District Court
Northern District of California

what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008). The State defendants move to dismiss the void-for-vagueness claim, arguing that "[b]ecause section 10.5 proscribes no speech or conduct, there is no need to provide fair notice of any proscription." State MTD at 14. O'Handley responds that the statute is void for vagueness because it grants OEC the right to "counteract false or misleading information" without defining those terms, and that O'Handley "had no way of knowing what it prohibited, while OEC officials had unbridled discretion to determine what speech warranted action." Opp'n to State MTD at 9.

The State defendants are right, though, that section 10.5 does not prohibit any conduct. It simply sets out the mission of the OEC. See Cal. Elec. Code § 10.5(b)(2) ("To monitor and counteract false or misleading information regarding the electoral process"); id. § (c)(8) ("Assess the false or misleading information regarding the electoral process . . . mitigate the false or misleading information, and educate voters"). It does not restrict what anyone can say. It is therefore "not amenable to a vagueness challenge." See United States v. Beckles, 137 S. Ct. 886, 895 (2017) (no vagueness challenge to U.S. Sentencing Guidelines, which "do not regulate the public by prohibiting any conduct"); see also State v. Dums, 149 Wis. 2d 314, 324 (1989) (void-for-vagueness statute does not apply where statute "does not prohibit conduct, but instead regulates the court's procedure"). And while O'Handley objects to the OEC's "unbridled discretion" under section 10.5, the Supreme Court in Beckles observed that "we have never suggested that unfettered discretion can be void for vagueness." 137 S. Ct. at 895. Unbridled discretion in enacting a statutory mission that does not proscribe or restrict an individual's conduct is particularly unproblematic.

The Court also rejects O'Handley's suggestion that "false and misleading" are vague terms that he could never hope to understand. See Opp'n to State MTD at 9. "False" and "misleading" are not vague. See, e.g., First Resort, Inc. v. Herrera, 860 F.3d 1263, 1274–75 (9th Cir. 2017) (ordinance prohibiting false or misleading advertising by clinics that do not offer abortion not vague); United States v. Matanky, 482 F.2d 1319, 1321–22 (9th Cir. 1973) (statute proscribing false statements in a manner within the jurisdiction of a department or agency of the United States

United States District Court
Northern District of California

not vague); United States v. Rodriguez-DeHaro, 192 F. Supp. 2d 1031, 1038–39 (E.D. Cal. 2002) (statute criminalizing the making of "any false or fictitious oral or written statement" in connection with acquisition of firearm not unconstitutionally vague).  While O'Handley repeatedly seeks to blur the line between truth and opinion,[22] the word "false" is not up for debate.

Accordingly, the Court DISMISSES the void-for-vagueness claim against the State defendants.

### 4.     Qualified Immunity

The State defendants next argue that the five defendants named in their individual capacity (Padilla, Dresner, Jones, Mahood and Valle) are all entitled to qualified immunity.  See State MTD at 16.  Qualified immunity shields government officials who are performing a discretionary function from money damages unless a plaintiff has pled "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (qualified immunity protects government officials performing a discretionary function).

The State defendants seeking qualified immunity were exercising a discretionary function by identifying and mitigating election misinformation pursuant to section 10.5.  What the parties dispute is whether O'Handley has pled that in exercising that discretionary function, those officials violated a constitutional right of O'Handley's that was clearly established.  This order already concludes that the Complaint fails to adequately allege the violation of a constitutional right.  But the Court also agrees that "there is no controlling precedent that would have informed the State [d]efendants in November 2020 that identifying social media posts containing false or misleading election information to the private platform on which they are posted violates a clearly established constitutional right to a point that is 'beyond debate.'"  See State MTD at 16.

---

[22] O'Handley asserts repeatedly that his statements were mere opinions.  See, e.g., Compl. ¶ 3 ("Twitter promptly complied with OEC's request to censor Mr. O'Handley's problematic opinions"); id. ¶ 73 (re 11/12/20 tweet: "Mr. O'Handley's Post expressed an opinion widely held by California voters"); ¶ 74 ("personal opinion"); Opp'n to State MTD at 1 ("politically inconvenient opinions"); Opp'n to SKDK MTD at 2 ("labeled Mr. O'Handley's opinion as 'misinformation'").  But "Election fraud is rampant nationwide" is not an opinion.  It is an assertion of fact.

O'Handley argues that he need not identify case law arising from analogous circumstances because "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Opp'n to State MTD at 11 (quoting <u>Villarreal v. City of Laredo, Texas</u>, No. 20-40359, 2021 WL 5049281, at *1 (5th Cir. Nov. 1, 2021) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002))).  He maintains that even if section 10.5 is valid, OEC's enforcement of it, "censoring and punishing private speech from public discourse because of the speech's viewpoint," is so clearly unlawful that "no reasonable person would consider it constitutional." <u>Id.</u> at 12.

But the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." <u>Ashcroft</u>, 563 U.S. at 742.  The Complaint here does not plausibly allege that the State defendants engaged in viewpoint discrimination.  It alleges that an unidentified OEC official sent a single message to Twitter, flagging a single O'Handley tweet without directing or even requesting that Twitter take any particular action in response to the tweet.  <u>See</u> Compl. ¶ 76; Compl. Ex. 9.  If there is clearly established law holding that a state employee violates an individual's constitutional rights by flagging his post to the social media company where he posted, O'Handley has not identified it.  Indeed, section 10.5 instructed such employees to mitigate false or misleading information.  <u>See</u> Cal. Elec. Code § 10.5(b)(2).

Because O'Handley failed to adequately allege that the State defendants violated his constitutional rights or that there was clearly established law such that "every reasonable official would have understood that what he [was] doing violate[d] that right," <u>see</u> <u>Ashcroft</u>, 563 U.S. at 741, the Court GRANTS qualified immunity to the individual State defendants.[23]

Accordingly, the Court GRANTS the State defendant's motion to dismiss as to each of the claims against them, save and except for the California Constitution (Free Speech Clause) claim.

### D.    SKDK Motion to Dismiss

SKDK moves to dismiss all of O'Handley's claims against it, arguing that (1) the

---

[23] The Court rejects O'Handley's invitation to revisit the law of qualified immunity more broadly. <u>See</u> Opp'n to State MTD at 13 n7.

United States District Court
Northern District of California

Complaint fails to establish O'Handley's standing; and (2) the Complaint fails to state a claim as to each cause of action.  SKDK is correct.

### 1.    Standing

SKDK's first argument is that the Court should dismiss the claims against it because O'Handley lacks standing.  To have standing, a plaintiff must establish (1) that he suffered an injury in fact, (2) that his injury is fairly traceable to a defendant's conduct, and (3) that his injury would likely be redressed by a favorable decision.  See Lujan, 504 U.S. at 560–61.  SKDK argues that O'Handley failed to establish an injury in fact resulting from SKDK's actions and that O'Handley's alleged injury is not traceable to SKDK's conduct.  SKDK MTD at 4–6.  This is two different ways of saying the same thing: SKDK is not to blame.

The Court agrees.  The only relevant allegation about SKDK's actions is that on November 13, 2020, SKDK included one of O'Handley's tweets in its "Misinformation Daily Briefing," which it emailed to Valle, Dresner, Mahood, and Jones at the OEC.  Compl. ¶¶ 57–58, 74, Ex. 6.  That briefing did not include any commentary about the tweet other than to list it under the heading "California."  Id. Ex. 6.  It did not instruct the State, or Twitter, to take any action.  That was the extent of SKDK's involvement with O'Handley.  SKDK's email to OEC did not cause O'Handley any direct harm, and the Complaint does not allege otherwise.  O'Handley instead must argue that the harm he experienced when Twitter suspended his account in February 2021— or perhaps when it labeled his tweets or added strikes to his account leading up to that—is traceable to SKDK's November 2020 conduct.  See Opp'n to SKDK MTD at 2.  He cannot do so.

"In cases where a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' injuries," the causal chain is "too weak to support standing."  See Maya, 658 F.3d at 1070.  If Twitter's enforcement actions regarding O'Handley's tweets cannot be traced back to the State's November 17, 2020 email to Twitter—which the Court concludes above—then those enforcement actions also cannot be traced back to SKDK's November 13, 2020 briefing email to the State.  That causal chain is even longer and involves additional independent decisions.

O'Handley again falls back on his allegations of conspiracy.  See Opp'n to SKDK at 2

35

United States District Court
Northern District of California

1   ("Mr. O'Handley was injured by the foreseeable consequences of the Defendants' conspiracy,

2   whose objectives SKDK both agreed to and contributed overt acts towards.") (citing Compl. ¶¶

3   56–57, 68, 74).  As discussed above, the conspiracy allegations are not plausible, particularly as to

4   the purpose of the defendants' work together.  See Reply re SKDK MTD (dkt. 77) at 9 ("Without

5   any non-conclusory allegations that SKDK had a meeting of the minds with the other Defendants

6   with the shared goal of depriving him of his constitutional rights, O'Handley has failed to plead a

7   conspiracy.").  They therefore do not save O'Handley's standing.

8            Accordingly, the Court DISMISSES the claims against SKDK for lack of standing.[24]

9            **2.       Failure to State a Claim**

10           SKDK's second argument is that the Complaint fails to state a claim as to each cause of

11   action.  SKDK MTD at 6–15.  SKDK argues that the constitutional claims fail because of lack of

12   state action and because SKDK did not act under color of state law,[25] and that the claims also fail

13   on their merits.  Id.

14                    **a.       State Action**

15           SKDK maintains that "O'Handley's claims under the First and Fourteenth Amendments,

16   Section 1983, and the California Constitution each fail because those provisions do not apply to

17   private actors like SKDK, but only against the government or those acting under color of state

18   law."  SKDK Reply at 6.  The Court does not reach the California Constitution (Free Speech

19   Clause) claim.  "[C]onduct allegedly causing the deprivation of a federal right [must] be fairly

20   attributable to the State."  Lugar, 457 U.S. at 937.  O'Handley responds that SKDK acted pursuant

21   to a $35 million contract with the State, and that, by joining in a conspiracy with the other

22   defendants, SKDK was a state actor.  Opp'n to SKDK MTD at 3–5.

23                    **i.       Contract**

24           That SKDK acted pursuant to a contract with the State does not means that its actions were

25

26   ────────────────

27   [24] The Court's ruling does not pertain to the California Constitution (Free Speech Clause) claim,
     over which the Court declines to exercise supplemental jurisdiction.

28   [25] SKDK treats these as separate arguments in its opening brief, see SKDK MTD at 6–10, but
     reluctantly adopts O'Handley's combined organization for its reply brief, see SKDK Reply at 6
     n.2.  This order also handles the state action inquiry all at once.

state actions.  In Rendell-Baker v. Kohn, 457 U.S. 830, 841 (1982), a private high school received

funds from the state and had to comply with state regulations.  Plaintiffs were former teachers at

the school who alleged that their discharges were unconstitutional.  Id. at 834.  The Supreme Court

held that the school's decisions to discharge the teachers were not "compelled or even influenced

by any state regulation."  Id. at 841.  It stated that "[t]he school . . . is not fundamentally different

from many private corporations whose business depends primarily on contracts [with] the

government.  Acts of such private contractors do not become acts of the government by reason of

their significant or even total engagement in performing public contracts."  Id. at 841–42.  In

Manhattan Community Access Corp., 139 S. Ct. at 1932, the Court likewise explained:

> Numerous private entities in America obtain government licenses,
> government contracts, or government-granted monopolies.  If those
> facts sufficed to transform a private entity into a state actor, a large
> swath of private entities in America would suddenly be turned into
> state actors and be subject to a variety of constitutional constraints
> on their activities.  As this Court's many state-action cases amply
> demonstrate, that is not the law.

To state a section 1983 claim against SKDK, O'Handley must demonstrate that,

notwithstanding SKDK's status as a private entity, SKDK was acting under color of state law.

See Gorenc, 869 F.2d at 506.  O'Handley argues that SKDK was doing so, based on the joint

action and the nexus tests.  Opp'n to SKDK MTD at 3.

### ii.  Conspiracy

O'Handley primarily asserts that he satisfies those tests because he has "plausibly allege[d]

that SKDK conspired with Defendants to deprive individuals of their constitutional rights."  Id. at

4 (citing Compl. ¶ 99).  But paragraph 99 of the Complaint is a conclusory three sentences about

"Twitter's real reasons for suspending" his account, and the only possible reference to SKDK is

the line that "[t]he trigger for Twitter's censorship of Mr. O'Handley was its coordination and

conspiracy with other Defendants to silence the protected speech of many Americans."  See

Compl. ¶ 99.  O'Handley lists as "Actions in furtherance of the conspiracy" a series of utterly

unremarkable events: "creating a state agency to 'monitor and counteract false or misleading

information,' outsourcing this task to SKDK with instructions to identify social media 'election

misinformation,' and 'working closely and proactively' with social media companies to 'take

United States District Court
Northern District of California

1   down sources of misinformation.'"  Opp'n to SKDK MTD at 4.  Again, such allegations might

2   demonstrate a meeting of the minds to promptly address election misinformation, but not a

3   meeting of the minds to violate anyone's constitutional rights.  See Fonda, 707 F.2d at 438.  The

4   conspiracy allegations are not plausible.

   iii.       Other Evidence of Joint Action/Nexus

6          O'Handley next contends that "[e]ven without evidence of conspiracy," it is possible to

7   demonstrate joint action.  Opp'n to SKDK MTD at 4–5.  That is true.  But then he insists that he

8   has met the joint action and nexus tests "[f]or the same reasons that SKDK and OEC 'conspired.'"

9   Id. at 5.  This is problematic for him given the lack of plausible allegations that the two conspired.

10         Moreover, the Complaint does not allege that the State exercised any control over the

11  substance of the "Misinformation Daily Briefing," or SKDK's decision to flag O'Handley's tweet.

12  "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify

13  holding the State responsible for those initiatives."  Blum, 457 U.S at 1004–05.  The State may

14  have acquiesced in SKDK's decision to flag O'Handley's tweet, but there are no plausible

15  allegations that the State substantially cooperated with SKDK's flagging of the tweet.  See

16  Brunette, 294 F.3d at 1212.  Nor was SKDK's decision to flag O'Handley's tweet "compelled or

17  even influenced by any state regulation."  See Rendell-Baker, 457 U.S. at 841.

18         The Complaint therefore fails to satisfy the joint action test.  For the same reasons, there

19  are not plausible allegations that "there is a sufficiently close nexus between the State and the

20  challenged action of the regulated entity so the action of the latter may be fairly treated as that of

21  the state itself.'"  See Gorenc, 869 F.2d at 506 (citing Jackson v. Metropolitan Edison Co., 419

22  U.S. 345, 351 (1974)); see also Villegas, 541 F.3d at 955.  And so the Complaint also fails to

23  satisfy the nexus test.  SKDK was not a state actor.  It cannot be liable under § 1983.  The Court

24  therefore DISMISSES the First Amendment, Equal Protection, and Due Process Claims against

25  SKDK.  The Court declines to exercise supplemental jurisdiction over the California Constitution

26  (Free Speech Clause) claim.

   b.       Remaining Claim

28         While SKDK makes a number of arguments about O'Handley's claims in addition to the

United States District Court
Northern District of California

1    state action argument, see SKDK MTD at 11–14, the Court need not reach them.  That leaves only

2    the section 1985 conspiracy claim against SKDK.  As discussed above in connection with Twitter

3    and the State defendants, the Complaint fails to adequately allege a meeting of the minds to violate

4    O'Handley's constitutional rights, and therefore fails to adequately allege a conspiracy.  See Bray,

5    506 U.S. at 268 (conspiracy must be aimed at interfering with protected rights); Sanchez, 936 F.2d

6    at 1039 ("mere allegation of conspiracy without factual specificity is insufficient.").  The Court

7    DISMISSES that claim against SKDK as well.

8         Accordingly, the Court GRANTS SKDK's motion to dismiss as to each of the claims

9    against it, save and except for the California Constitution (Free Speech Clause) claim.

10        **E.    NASS Motion to Dismiss**

11        Finally, NASS moves to dismiss all of O'Handley's claims against it, arguing that (1) the

12   Court lacks personal jurisdiction over NASS, and (2) the Complaint fails to state a claim as to

13   each cause of action.  See NASS MTD.[26]  While a "plaintiff need make only a prima facie

14   showing of jurisdictional facts to withstand [a] motion to dismiss," Ballard, 65 F.3d at 1498,

15   O'Handley has not done so; the Court therefore lacks jurisdiction over NASS.  In addition, the

16   Complaint fails to state a claim.

17        **1.    Personal Jurisdiction**

18        NASS argues that it is an out-of-state nonprofit organization over which the Court has no

19   personal jurisdiction.  See NASS MTD at 12–17.  NASS notes that it has never had subsidiaries or

20   offices or employees or bank accounts or registered agents in California, has never been registered

21   to do business in California, has no current officers or directors in California, does not direct

22   advertising toward California, and has not contracted with anyone in California to do advertising

23   here.  Id. at 9–10 (citing Reynolds Decl. ¶¶ 2, 8).  A court has personal jurisdiction over a non-

24   resident defendant when that defendant has "certain minimum contacts with [the forum state] such

25   that the maintenance of the suit does not offend traditional notions of fair play and substantial

26   justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted).

27

28   _____

[26] NASS does not argue, as the State defendants and SKDK do, that O'Handley lacks standing to
sue it.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California's long-arm statute allows the exercise of personal jurisdiction to the full extent

2    permissible under the U.S. Constitution.  Daimler AG v. Bauman, 571 U.S. 117, 125 (2014).

3         Personal jurisdiction can be either general or specific.  Data Disc, 557 F.2d at 1287.  NASS

4    argues that the Court lacks both general jurisdiction and specific jurisdiction.  See NASS MTD at

5    12–17.  O'Handley does not contest that this Court lacks general jurisdiction.  See generally

6    Opp'n to NASS MTD (dkt. 67).  The question is therefore whether the Court has specific

7    jurisdiction.

8         "There are three requirements for a court to exercise specific jurisdiction over a

9    nonresident defendant: (1) the defendant must either 'purposefully direct his activities' toward the

10   forum or 'purposefully avail himself of the privileges of conducting activities in the forum'; (2)

11   'the claim must be one which arises out of or relates to the defendant's forum-related activities';

12   and (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must

13   be reasonable.'"  Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1068 (9th Cir. 2017)

14   (original alterations omitted).  The plaintiff has the burden on the first two prongs, after which "the

15   burden . . . shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction

16   would not be reasonable."  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir.

17   2004).

18        While the parties initially disagreed about whether the purposeful availment or purposeful

19   direction tests apply, see NASS MTD at 13; Opp'n to NASS MTD at 4, they ultimately agreed

20   that the Court should apply the "Calder test" pursuant to Calder v. Jones, 465 U.S. 783 (1984), see

21   Opp'n to NASS MTD at 4 (applying Calder); Reply re NASS MTD (dkt. 76) at 8–12 (applying

22   Calder); see also Yahoo! Inc. v. LA Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199

23   (9th Cir. 2006) (applying Calder test to case involving constitutional claims).  The Calder test

24   requires that a defendant have "(1) committed an intentional act, (2) expressly aimed at the forum

25   state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."

26   Yahoo!, 433 F.3d at 1206.

27        O'Handley argues that NASS expressly aimed its censorship efforts at California, knowing

28   that harm would occur here.  See Opp'n to NASS MTD at 4–6.  But the allegations do not support

40

that position.  The Complaint alleges broadly that NASS "spearheaded efforts to censor disfavored election speech" by "creat[ing] direct channels of communication between Secretaries of States' staff and social media companies."  Compl. ¶¶ 26, 27.  It focuses on three emails that NASS's Director of Communications presumably sent to all of its members' "Communications Directors." See id. Exs. 2–4.  Those emails: (1) state that "Twitter asked her to let Secretary of States' offices know that it had created a separate dedicated way for election officials to 'flag concerns directly to Twitter,'" id. ¶ 28, Ex. 2 (10/1/20 email); (2) explain that "if your state is onboarded into the [Twitter] partner support portal, it provides a mechanism to report election issues and get them bumped to the head of the queue," id. ¶ 29, Ex. 3 (8/28/20 email); and (3) state that "If you see something on a platform, please report it.  In addition, please pass this on to your local election officials as well.  I would also appreciate a heads up so I know what is going on, this helps us create a more national narrative," id. ¶ 30, Ex. 4 (4/30/19 email).

NASS contends that those contacts are inadequate.  NASS MTD at 14 (citing Asahi Metal Industries Co. v. Superior Court of California, 480 U.S. 102 (1987)).  In Asahi, 480 U.S. at 112, the Supreme Court explained that it was not enough to put a product into the stream of commerce, knowing "that the stream of commerce may or will sweep the product into the forum state."  The manufacturer in that case had no offices, agents, employees, or property in California, and did not control the distribution system that carried its product into California.  Id. at 108.  It was not subject to personal jurisdiction in California because there was no "additional conduct" that would "indicate an intent or purpose to serve the market in the forum State, like designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a . . . sales agent in the forum State."  Id. at 112; see also Rio Props., Inc. v. Rio Intern. Interlink, 284 F.3d 1007, 1019 (9th Cir. 2002) (passive website was inadequate for express aiming; "'something more' was required to indicate that the defendant purposefully directed its activity in a substantial way to the forum state.").  NASS argues persuasively that, as in Asahi, it had no presence in California and no additional conduct demonstrating a focus on California.  NASS MTD at 14.

Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218 (9th Cir. 2011), to which

O'Handley cites, see Opp'n to NASS MTD at 4–5, is an example of what "additional conduct" or "something more" might look like. In that case, Brand posted celebrity photos taken by Mavrix on its website without Mavrix's permission. Mavrix Photo, Inc., 647 F.3d at 1223. Even though Brand had no offices, property or staff in California, it had a number of other ties—profiting from third-party advertisements in California, including on its site a Ticket Center that sold tickets to events in California, having agreements with several California businesses, including a link-sharing agreement with a California-based news site, and having "[a] substantial number of hits" on the website from California residents—that made specific jurisdiction appropriate. Id. at 1222, 1229, 1230; see also id. at 1229 ("Brand used Mavrix's copyrighted photos as part of its exploitation of the California market for its own commercial gain."). NASS does not have any comparable ties to California, and cannot be said to be exploiting California through its emails. See also PREP Tours, Inc. v. American Youth Soccer Organization, 913 F.3d 11, 23–24 (1st Cir. 2019) (nine emails and a number of telephone calls to single recipient in forum state did not show that the defendants were "contemplating the kind of ongoing and close-working relationship . . . that could establish the requisite substantial connection between the defendants and the forum.").

O'Handley would dispute that NASS's involvement in this case is limited to emails. He argues in his opposition brief that "NASS specifically coordinated with both Twitter and OEC, both located in California"[27] and "actually set the ball in motion, creating [the portal] in partnership with Twitter, and then repeatedly encouraging its membership to join the portal, giving its members guidance and direction on portal use, using the portal to itself request speech censorship on behalf of its members, and serving as a liaison between Twitter and its members." Opp'n to NASS MTD at 6. But there is no allegation in the Complaint that NASS created, or co-created, the Portal.[28] And despite O'Handley's assertion in opposing NASS's motion that NASS

---

[27] O'Handley suggests that there is jurisdiction because Twitter and "all major social media platforms" are in California. See Opp'n to NASS MTD at 5. Under that theory, California would have jurisdiction over all cases involving social media.

[28] There is a vague allegation in the Complaint that "NASS created direct channels of communication between Secretaries of States' staff and social media companies to facilitate the quick take-down of speech deemed 'misinformation.'" Compl. ¶ 27. The Court reads that allegation as a reference to NASS's emails alerting its members to the Portal, and to other social media companies' similar tools. The next paragraph alleges that Twitter created the Portal and

was involved in the creation of the Portal, see, e.g., id. at 1 ("NASS worked specifically with Twitter . . . to create [the Portal]"); id. at 2 ("Prior to OEC using the portal created and promulgated by NASS"), his arguments in opposing other motions reflect that only Twitter created the Portal, see Opp'n to Twitter MTD at 1 ("Twitter established the 'Partner Support Portal'"); Opp'n to State MTD at 3 ("By using a dedicated portal Twitter created"). Nor is it accurate to say that NASS repeatedly encouraged its members to join the Portal. See Compl. Ex. 2 ("If you do decide to join the [Portal] please cc' me for awareness. . . But alas, if you'd like to just report to the new CIS reporting structure that works too!  Up to you!"), Ex. 3 ("If you're not on the list and would like to get on-boarded please email psponboarding@twitter.com"), Ex. 4 ("Twitter has an election partner portal which NASS has access to").  And the only allegation that NASS used "the portal to itself request speech censorship on behalf of its members" is the email that states that Twitter has a Portal and "You will need to email me . . . as much information as you have and I will submit it through the portal." Id. Ex. 4.  That email says nothing about censorship.

Ultimately, the Court is not persuaded that NASS's emails to all of its members—rather than to the California Secretary of State in particular—informing them about the Portal demonstrate the kind of express aiming required under Calder.  National organizations are not subject to jurisdiction in every state where their members live.  See Szabo v. Med Info. Bureau, 127 Cal. App. 3d 51, 53 (1981) (collecting cases).[29]  Presumably that holds true even if the organization emails all of its members.

O'Handley has failed to meet the Calder test.  The Court need not reach the remainder of

---

that NASS's role was to alert its members to its existence.  See id. ¶ 28 (". . . Twitter asked her to let Secretary of States' offices know that it had created a separate dedicated way for election officials to 'flag concerns directly to Twitter.'"); see also Compl. Ex. 2.

[29] Amazon.com, Inc. v. National Association of College Stores, Inc., 826 F. Supp. 2d 1242 (W.D. Wash. 2011), on which O'Handley relies, see Opp'n to NASS MTD at 4–5, is distinguishable.  Although that case involved a nonprofit trade association, the basis for jurisdiction was not that the association had a member in a particular state or even that it had communicated with that member.  The trade association had sent a letter to Amazon raising a legal concern, then initiated a challenge against Amazon before the Better Business Bureau.  Id. at 1246–47.  There was jurisdiction because the trade association had "expressly aimed its actions at Washington by individually targeting Amazon, the Washington-based plaintiff."  Id. at 1255.  NASS did not "individually target[]" California.  It sent its emails to all of its members.

United States District Court
Northern District of California

the specific jurisdiction requirements, and GRANTS the motion for lack of personal jurisdiction.

## 2.   Failure to State a Claim

NASS next argues that the Complaint fails to state a claim as to each cause of action. NASS MTD at 17–26. NASS asserts that the federal constitutional claims and California Constitution (Free Speech Clause) claim fail because NASS is not a state actor, id. at 17–25, and that the section 1985 claim fails because O'Handley fails to allege a conspiracy that would violate his constitutional rights, id. at 25–26; Reply re NASS MTD at 19–20.

### a.   State Action

As discussed above in connection with the other defendants, NASS is correct that the Complaint's federal constitutional claims require state action.[30] Moreover, as NASS points out, there is a "'presumption that private conduct does not constitute governmental action.'" NASS MTD at 20 (quoting Sutton v. Providence St. Joseph Med. Center, 192 F.3d 826, 835 (9th Cir. 1999)). O'Handley concedes this point as to the federal claims, but asserts that he has overcome the presumption here, because NASS and the State "'acted in concert in effecting a particular deprivation of constitutional rights.'" Opp'n to NASS MTD at 8–10 (quoting Tsao, 698 F.3d at 1140). He asserts that the Complaint satisfies both the joint action test and the nexus test, largely because of his conspiracy allegations. Id.

#### i.   Conspiracy

O'Handley's conspiracy allegations do not demonstrate that NASS acted jointly with the State. See id. (citing Compl. ¶ 99). As discussed above, paragraph 99 of the Complaint is a conclusory three sentences about "Twitter's real reasons for suspending" O'Handley's account, and the only possible reference to NASS is the line that "[t]he trigger for Twitter's censorship of Mr. O'Handley was its coordination and conspiracy with other Defendants to silence the protected speech of many Americans." See Compl. ¶ 99. O'Handley argues that NASS's emails with OEC about reporting misinformation through the Twitter Portal prove that the defendants had a meeting of the minds. Opp'n to NASS MTD at 9–10 (citing Compl. Exs. 2, 3). But those emails from

---

[30] Again, the Court will not reach the California Constitution (Free Speech Clause) claim herein.

United States District Court
Northern District of California

1   NASS to its members do not reflect a meeting of the minds to do <u>anything</u>; they show NASS

2   passing along information, <u>see</u> Compl. Ex. 2 (members free to use Twitter Portal or alternative

3   tool; "Up to you!"), and in one instance asking, "If you see [Mis/Disinformation] on a platform,

4   please report it," <u>id.</u> Ex. 4.  Even if they reflected a meeting of the minds to counteract election

5   misinformation, that is not a meeting of the minds to violate constitutional rights.  See <u>Fonda</u>, 707

6   F.2d at 438.

7           O'Handley's additional arguments about conspiracy fare no better.  He again states that

8   NASS "work[ed] with Twitter to create" the Portal, <u>see</u> Opp'n to NASS MTD at 9, an allegation

9   absent from the Complaint.  He contends that NASS "gave California's OEC guidance regarding

10  how to report mis/disinformation directly," but cites only to an allegation in the Complaint that

11  NASS emailed all of its members that it "wanted election officials to have NASS's email guidance

12  regarding how to report 'mis/disinformation' directly to social media companies 'handy.'"  See <u>id.</u>

13  (citing Compl. ¶ 31, Ex. 4).  And he adds that NASS asked its members to alert it to

14  misinformation so that it could "create a more national narrative."  <u>Id.</u> (citing Compl. ¶ 30, Ex. 4).

15  But sharing information with Secretaries of State is not an act "unlikely to have been undertaken

16  without an [illicit] agreement," <u>see</u> <u>Mendocino Env'tl Ctr.</u>, 192 F.3d at 1301.  It is NASS's explicit

17  purpose.  <u>See</u> Reynolds Decl. ¶¶ 3, 6 (NASS is a nonprofit professional organization whose

18  function is to "serve[] as a medium for the exchange of information between states" and to

19  "foster[] cooperation in the development of public policy.").

20          The conspiracy allegations are not plausible.

21                          **ii.      Other Evidence of Joint Action/Nexus**

22          O'Handley again contends that "[e]ven without evidence of conspiracy," he has met the

23  joint action and nexus tests "[f]or the same reasons that NASS and OEC 'conspired.'"  <u>Id.</u> at 5.

24  Again, this argument is unavailing given the lack of plausible allegations that the two conspired.

25  O'Handley cites to allegations that "NASS instructed OEC on how to report [misinformation] to

26  Twitter," that OEC used the Portal, and that NASS later "awarded OEC for their censorship

27  efforts," Opp'n to NASS MTD at 10 (citing Compl. ¶¶ 32, 61, 64, Ex. 4).  O'Handley thus

28  concludes that NASS "affirmed, authorized, encouraged and facilitated the plan to have

45

Secretaries of State, including OEC, report disfavored tweets directly to social media," and that OEC "'affirmed, authorized, encouraged, and facilitated' NASS's efforts by their use of the portal." Id. (referencing Polk v. Yee, 481 F. Supp. 3d 1060, 1068 (E.D. Cal. 2020)).

The court in Polk, 481 F. Supp 3d at 1066, recognized that one way of showing joint action is "where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." That case involved a section 1983 suit against the California State Controller and the Union, alleging the deprivation of the First Amendment right to refrain from subsidizing Union speech through dues. Id. at 1063–64. The Union moved to dismiss, asserting a lack of state action. Id. at 1066. The court held that despite "a connection between the constitutional violation and the state action," the plaintiffs had failed to allege "that the Union acted in concert with the state to cause the [harm], especially given the state's lack of involvement in the drafting and executing of the Union agreements." Id. at 1067.

Here, there are no plausible allegations that NASS or the State affirmed any unconstitutional conduct by the other. The State's alleged agreement to use the Portal did not affirm unconstitutional conduct, as an organization emailing its members with information about how to report election misinformation is not unconstitutional. NASS's award to OEC, premised OEC's identification and removal of "misinformation," Compl. ¶ 65, Ex. 8, and "misleading social media posts," id. ¶ 64—not "disfavored tweets," see Opp'n to NASS MTD at 10—also did not affirm unconstitutional conduct, as identifying and removing such material is not unconstitutional.

And, as in Polk, 481 F. Supp. 3d at 1067, there is a "lack of involvement" by the State here. NASS is a private organization that emailed its members information about how to report election misinformation. See Compl. ¶¶ 27–31, Exs. 2–4. Sharing information with the government does not amount to joint action. See Lockhead, 24 Fed. App'x at 806. The Complaint does not allege that the State told NASS to send its emails. It alleges only that the State made use of the information NASS sent, employing the Portal to report election misinformation. Compl. ¶ 32 (not actually stating that the State did so when flagging O'Handley's tweet). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives." Blum, 457 U.S at 1004–05. In

addition, the circuit requires "substantial cooperation" or that the private entity's and government's actions be "inextricably intertwined." See Brunette, 294 F.3d at 1212. There are no plausible allegations that the two entities' actions were inextricably intertwined. See Brunette, 294 F.3d at 1212–13 (no joint action where each party acted independently and did not assist one another with their separate tasks). There are no plausible allegations that NASS substantially cooperated, or cooperated at all, in the State's review of social media posts and its determinations of which posts to flag as misinformation.

The Complaint therefore fails to satisfy the joint action test. For the same reasons, there are not plausible allegations to satisfy the nexus test. See Gorenc, 869 F.2d at 506; Villegas, 541 F.3d at 955. NASS, like Twitter and SKDK, was not a state actor. It cannot be liable under § 1983. The Court therefore DISMISSES the First Amendment, Equal Protection, and Due Process Claims against NASS.

### b. 1985 Claim

As discussed above in connection with the other defendants, the Complaint fails to adequately allege a meeting of the minds to violate O'Handley's constitutional rights, and therefore fails to adequately allege a conspiracy. See Bray, 506 U.S. at 268 (conspiracy must be aimed at interfering with protected rights); Sanchez, 936 F.2d at 1039 ("mere allegation of conspiracy without factual specificity is insufficient."). The Court DISMISSES that claim against NASS as well.

Accordingly, the Court GRANTS NASS's motion to dismiss as to each of the claims against it, save and except for the California Constitution (Free Speech Clause) claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motions to dismiss. The Court dismisses all of the federal claims with prejudice, as it is convinced that, given the infirmities in the current complaint, O'Handley could not amend sufficiently to state a claim. See Cook, Perkiss & Liehe, Inc., 911 F.2d at 246–47 (amendment would be futile). The Court dismisses the California Constitution (Free Speech Clause) claim without prejudice to O'Handley bringing that claim in state court. The Court does not reach Twitter's Anti-SLAPP Motion.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: January 10, 2022



CHARLES R. BREYER
United States District Judge