**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROGAN O'HANDLEY, *Plaintiff-Appellant*, v. SHIRLEY WEBER; TWITTER INC., a Delaware corporation; NATIONAL ASSOCIATION OF SECRETARIES OF STATE, a professional nonprofit organization, *Defendants-Appellees*. | No. 22-15071 D.C. No. 3:21-cv-07063-CRB OPINION |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted December 7, 2022
San Francisco, California

Filed March 10, 2023

Before: Susan P. Graber, Evan J. Wallach,[*] and Paul J.
Watford, Circuit Judges.

Opinion by Judge Watford

---

[*] The Honorable Evan J. Wallach, United States Circuit Judge for the
U.S. Court of Appeals for the Federal Circuit, sitting by designation.

# SUMMARY[**]

### Civil Rights

The panel affirmed the district court's order dismissing plaintiff's federal constitutional claims and declining to exercise supplemental jurisdiction over a state law claim in an action brought pursuant to 42 U.S.C. § 1983 alleging that the social media company Twitter Inc., and California's Secretary of State, Shirley Weber, violated plaintiff's constitutional rights by acting in concert to censor his speech on Twitter's platform.

Plaintiff alleged that the Secretary of State's office entered into a collaborative relationship with Twitter in which state officials regularly flagged tweets with false or misleading information for Twitter's review and that Twitter responded by almost invariably removing the posts in question. Plaintiff further alleged that, after a state official flagged one of his tweets as false or misleading, Twitter limited other users' ability to access his tweets and then suspended his account, ostensibly for violating the company's content-moderation policy.

The panel agreed with the district court's determination that Twitter's interactions with state officials did not transform the company's enforcement of its content-moderation policy into state action. The panel held that Twitter's content-moderation decisions did not constitute state action because (1) Twitter did not exercise a state-conferred right or enforce a state-imposed rule under the first

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

step of the two-step framework set forth in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); and (2) the interactions between Twitter and the Secretary of State's Office of Elections Cybersecurity did not satisfy either the nexus or the joint action tests under the second step. The panel concluded that its resolution of this issue was determinative with respect to plaintiff's claims under § 1983 because each of those claims required proof of state action. Plaintiff's claim under 42 U.S.C. § 1985 also failed because the test for proving a conspiracy between a private party and the government to deprive an individual of constitutional rights under § 1985 tracked the inquiry under the conspiracy formulation of the joint action test.

The panel held that plaintiff had standing to seek injunctive relief against Secretary Weber and that, even though the Secretary was not responsible for Twitter's content-moderation decisions, state action existed insofar as officials in her office flagged plaintiff's November 12, 2020, post. Limiting its review to those actions, the panel nevertheless affirmed the district court's dismissal of plaintiff's federal claims under Federal Rule of Civil Procedure 12(b)(6) because the Secretary's office did not engage in any unconstitutional act.

Having properly dismissed plaintiff's federal claims with prejudice, the district court did not abuse its discretion when it declined to exercise supplemental jurisdiction over plaintiff's remaining claim under the California Constitution.

## COUNSEL

Karin M. Sweigart (argued) and Harmeet K. Dhillon, Dhillon Law Group Inc., San Francisco, California; Ronald D. Coleman, Dhillon Law Group Inc., Newark, New Jersey; for Plaintiff-Appellant.

Ari Holtzblatt (argued), Patrick J. Carome, and Susan M. Pelletier, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Emily Barnet and Rishita Apsani, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Felicia H. Ellsworth, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; David C. Marcus, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; Thomas G. Sprankling, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, California; for Defendant-Appellee Twitter Inc.

Anna Ferrari (argued), Deputy Attorney General; Paul Stein, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General; San Francisco, California; Melissa Muller, Certified Law Student, Yale Law School, New Haven, Connecticut; Andrew Albright, Certified Law Student, University of California Berkeley Law School, Berkeley, California; for Defendant-Appellee California Secretary of State Dr. Shirley N. Weber.

Christine M. Wheatley and Don Willenburg, Gordon Rees Scully Mansukhani LLP, Oakland, California, for Defendant-Appellee National Association of Secretaries of State.

David A. Greene and Mukund Rathi, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

## OPINION

WATFORD, Circuit Judge:

Rogan O'Handley contends that the social media company Twitter Inc. and California's Secretary of State, Shirley Weber, violated his constitutional rights by acting in concert to censor his speech on Twitter's platform. He alleges that the Secretary of State's office entered into a collaborative relationship with Twitter in which state officials regularly flagged tweets with false or misleading information for Twitter's review and that Twitter responded by almost invariably removing the posts in question. O'Handley further alleges that, after a state official flagged one of his tweets as false or misleading, Twitter limited other users' ability to access his tweets and then suspended his account, ostensibly for violating the company's content-moderation policy.

The district court determined that Twitter's interactions with state officials did not transform the company's enforcement of its content-moderation policy into state action. We agree with that conclusion and, accordingly, affirm the dismissal of O'Handley's federal claims against Twitter, as each of those claims requires proof either that Twitter was a state actor or that it conspired with state actors to deprive O'Handley of his constitutional rights. We also affirm the dismissal of O'Handley's claims against Secretary of State Weber because her office did not violate federal law

when it notified Twitter of tweets containing false or misleading information that potentially violated the company's content-moderation policy.

I

At the time of the events giving rise to this lawsuit, Twitter was a social media company with more than 300 million active users. The company had adopted and was enforcing a set of policies, called the Twitter Rules, governing what its users could post on the platform. These rules were publicly available on the company's website, and all Twitter users had to agree to comply with them as a condition of using the service.

The portion of the Twitter Rules relevant to this appeal—known as the Civic Integrity Policy—informed users that they "may not use Twitter's services for the purpose of manipulating or interfering in elections or other civic processes." This prohibition covered statements that "could undermine faith in the process itself, such as unverified information about election rigging, ballot tampering, vote tallying, or certification of election results." The Civic Integrity Policy warned users that Twitter would remove posts that violated the policy's terms and that the company would suspend repeat violators.

Given the large volume of posts on its platform, Twitter was unable to review every tweet for compliance with its Civic Integrity Policy. Recognizing this reality, Twitter created several channels that enabled outside actors to assist in enforcement of the policy by reporting suspected violations. For example, ordinary Twitter users could report violations on the platform by clicking on the "Report Tweet" icon and selecting the option "[i]t's misleading about a political election or other civic event." A limited number of

government agencies and civil society groups also had access to an expedited review process through what Twitter called its Partner Support Portal. After an approved partner flagged a tweet through the Portal, Twitter's content moderators reviewed the post and decided whether remedial action was warranted. Twitter granted Portal access to election officials in at least 38 States, including California's Secretary of State.

In 2018, California formed the Office of Elections Cybersecurity (OEC) within the Secretary of State's office "[t]o monitor and counteract false or misleading information regarding the electoral process that is published online or on other platforms and that may suppress voter participation or cause confusion and disruption of the orderly and secure administration of elections." Cal. Elec. Code § 10.5(b)(2). The OEC has stated that, to fulfill its mission, it prioritizes "working closely with social media companies to be proactive so when there's a source of misinformation, we can contain it."

In the aftermath of the 2020 election, the OEC touted that it had flagged for Facebook and Twitter nearly "300 erroneous or misleading social media posts" and that "98 percent of those posts were promptly removed for violating the respective social media compan[ies'] community standards." Former Secretary of State Alex Padilla similarly noted that the OEC "worked in partnership with social media platforms to develop more efficient reporting procedures for potential misinformation" and that the content the OEC reported "was promptly reviewed and, in most cases, removed by the social media platforms."

O'Handley is one of the Twitter users whose posts the OEC flagged. As alleged in his complaint, O'Handley is a

licensed attorney who makes his living as a political commentator, including on social media where he operates under the handle "@DC_Draino." On November 12, 2020, just over a week after the presidential election, he posted the following tweet on his Twitter account:

> Audit every California ballot
>
> Election fraud is rampant nationwide and we all know California is one of the culprits
>
> Do it to protect the integrity of that state's elections

Five days later, an unidentified member of the OEC allegedly sent the following message to Twitter through the Partner Support Portal:

> Hi, We wanted to flag this Twitter post: https://twitter.com/DC_Draino/status/1237073866578096129 From user @DC_Draino. In this post user claims California of being a culprit of voter fraud, and ignores the fact that we do audit votes. This is a blatant disregard to how our voting process works and creates disinformation and distrust among the general public.

O'Handley does not allege that the OEC communicated with Twitter about him on any other occasion. But based on past communications between the OEC and Twitter regarding other users, he alleges that the message constituted a request that Twitter "take down" his post from its platform. O'Handley further alleges that, on or about the same day that Twitter received the OEC's message, the company (1)

appended a warning label to his tweet stating that the tweet's election fraud claim was "disputed," (2) limited other users' ability to access and interact with his tweet, and (3) assessed a "strike" against his account. O'Handley asserts that this was Twitter's first disciplinary action against him and that the company heavily scrutinized his activity on the platform thereafter.

The increased scrutiny that O'Handley allegedly faced aligned with a broader change in Twitter's policy around that time. In the aftermath of the January 6, 2021, attack on the U.S. Capitol, the company revamped its Civic Integrity Policy to "aggressively increase . . . enforcement action" against "misleading and false information surrounding the 2020 US presidential election." As part of this reform, Twitter instituted a five-strike protocol under which it would impose progressively harsher sanctions with each subsequent violation of the policy. If a user received a fifth strike, Twitter would permanently suspend that user's account.

Under the terms of this new protocol, Twitter allegedly issued four additional strikes against O'Handley in early 2021 in response to his repeated posts insinuating that the 2020 presidential election had been rigged. Upon issuing a fifth strike against O'Handley in late February 2021, Twitter informed him that his account had been permanently suspended for "violating the Twitter Rules . . . about election integrity."

Four months after his suspension, O'Handley filed this action against Twitter, Secretary of State Weber in her official capacity, and several other defendants. Asserting claims under 42 U.S.C. § 1983, O'Handley alleged that the defendants violated the First Amendment, as well as the

Equal Protection and Due Process Clauses of the Fourteenth Amendment, by censoring his political speech based on its content and viewpoint and by removing him from Twitter's platform.    In addition, he alleged that the defendants conspired to interfere with the exercise of his First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1985 and that their conduct violated the California Constitution's Liberty of Speech Clause.    Finally, he asserted a claim under 42 U.S.C. § 1983 alleging that California Elections Code § 10.5—the provision defining the OEC's mission—is unconstitutionally vague.

The defendants moved to dismiss O'Handley's action under Federal Rule of Civil Procedure 12(b)(1) and (b)(6). The district court granted the motions.  With respect to the claims against Twitter, the court held that the federal constitutional claims failed as a matter of law because Twitter is not a state actor and that its interactions with the OEC did not transform it into a state actor.  It also held that O'Handley had not plausibly alleged that Twitter conspired with California officials to violate his constitutional rights. As to Secretary of State Weber, the court concluded that O'Handley's federal claims failed for three reasons: (1) he lacked standing to sue because his injuries were not fairly traceable to the Secretary's actions; (2) he failed to plausibly allege state action; and (3) he failed to allege facts plausibly stating claims upon which relief could be granted.   The district court dismissed the federal claims against the other defendants and then declined to exercise supplemental jurisdiction over the remaining state law claim.  Following entry of final judgment, O'Handley appealed.

On appeal, O'Handley challenges only the dismissal of his claims against Twitter and Secretary of State Weber.  We

address the claims against those two defendants in turn, beginning with Twitter.

## II

As a private company, Twitter is not ordinarily subject to the Constitution's constraints. *See Prager University v. Google LLC*, 951 F.3d 991, 995–99 (9th Cir. 2020). Determining whether this is one of the exceptional cases in which a private entity will be treated as a state actor for constitutional purposes requires us to grapple with the state action doctrine. This area of the law is far from a "model of consistency," *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 378 (1995) (citation omitted), due in no small measure to the fact that "[w]hat is fairly attributable [to the State] is a matter of normative judgment, and the criteria lack rigid simplicity," *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001). Despite the doctrine's complexity, this case turns on the simple fact that Twitter acted in accordance with its own content-moderation policy when it limited other users' access to O'Handley's posts and ultimately suspended his account. Because of that central fact, we hold that Twitter did not operate as a state actor and therefore did not violate the Constitution.

We analyze state action under the two-step framework developed in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Under this framework, we first ask whether the alleged constitutional violation was caused by the "exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* at 937. If the answer is yes, we then ask whether "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Id.*

A

O'Handley's claims falter at the first step. Twitter did not exercise a state-created right when it limited access to O'Handley's posts or suspended his account. Twitter's right to take those actions when enforcing its content-moderation policy was derived from its user agreement with O'Handley, not from any right conferred by the State. For that reason, O'Handley's attempt to analogize the authority conferred by California Elections Code § 10.5 to the "procedural scheme" in *Lugar* is wholly unpersuasive. *Id.* at 941. *Lugar* involved a prejudgment attachment system, created by state law, that authorized private parties to sequester disputed property. *Id.* Section 10.5, by contrast, does not vest Twitter with any power and, under the terms of the user agreement to which O'Handley assented, no conferral of power by the State was necessary for Twitter to take the actions challenged here.[1]

Nor did Twitter enforce a state-imposed rule when it limited access to O'Handley's posts and suspended his account for "violating the Twitter Rules . . . about election integrity." As the quoted message that Twitter sent to O'Handley makes clear, the company acted under the terms of its own rules, not under any provision of California law. That Twitter and Facebook allegedly removed 98 percent of

---

[1] The district court determined that Twitter has not only the power to control the content posted on its platform but also a First Amendment right to do so. Whether social media companies' content-moderation decisions are constitutionally protected exercises of editorial judgment has divided our sister circuits recently. *See NetChoice, LLC v. Attorney General of Florida*, 34 F.4th 1196 (11th Cir. 2022), *petition for cert. docketed*, No. 22-277 (U.S. Sept. 23, 2022); *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *petition for cert. docketed*, No. 22-555 (U.S. Dec. 19, 2022). We need not reach that constitutional issue to resolve this case.

the posts flagged by the OEC does not suggest that the companies ceded control over their content-moderation decisions to the State and thereby became the government's private enforcers. It merely shows that these private and state actors were generally aligned in their missions to limit the spread of misleading election information. Such alignment does not transform private conduct into state action.

B

Under the original formulation of the *Lugar* framework, O'Handley's failure to satisfy the first step would have been fatal to his attempt to establish state action. More recent cases, however, have not been entirely consistent on this point. We have refused to apply the two-step framework rigidly, and we have suggested that the first step may be unnecessary in certain contexts. *See Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498, 503 n.3 (9th Cir. 1996) (evaluating only the second step of the *Lugar* framework to determine whether a private party operated as a state actor). Given this lack of clarity, we address the framework's second step for the sake of completeness. Nevertheless, our analysis of the first step makes it much less likely that O'Handley can satisfy the second because the two steps are united in a common inquiry into "whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161, 1167 (9th Cir. 2021) (citation omitted).

The second step of the *Lugar* framework asks whether "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at

937.  The Court in *Lugar* outlined four tests to determine the answer to that question: (1) the public function test, (2) the state compulsion test, (3) the nexus test, and (4) the joint action test.  *Id.* at 939.  O'Handley relies only on the nexus and joint action tests.  We conclude that neither is satisfied here.

*Nexus Test*.  There are two different versions of the nexus test.  The first (and less common) formulation asks whether there is "pervasive entwinement of public institutions and public officials in [the private actor's] composition and workings."  *Brentwood Academy*, 531 U.S. at 298.  In applying this version of the test, we look to factors such as whether the private organization relies on public funding, whether it is composed mainly of public officials, and whether those public officials "dominate decision making of the organization."  *Villegas v. Gilroy Garlic Festival Association*, 541 F.3d 950, 955 (9th Cir. 2008) (en banc).  Twitter lacks all of those attributes, so O'Handley cannot show that Twitter is a state actor under this first version of the nexus test.

The second version asks whether government officials have "exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  One circumstance in which this version of the test will be satisfied is when government officials threaten adverse action to coerce a private party into performing a particular act.  For example, we had no trouble finding the nexus test satisfied when a deputy county attorney threatened to prosecute a regional telephone company if it continued to carry a third party's dial-a-message service.  *See Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d

1291, 1295 (9th Cir. 1987). No equivalent threat by any government official is present in this case. O'Handley has alleged that an OEC official flagged one of his tweets and, at most, requested that Twitter remove the post. This request, which Twitter was free to ignore, is far from the type of coercion at issue in *Carlin*.

This second version of the nexus test can also be satisfied when certain forms of government encouragement are present. The critical question becomes whether the government's encouragement is so significant that we should attribute the private party's choice to the State, out of recognition that there are instances in which the State's use of positive incentives can overwhelm the private party and essentially compel the party to act in a certain way. However, nothing of the sort is present here. The OEC offered Twitter no incentive for taking down the post that it flagged. Even construing the facts alleged in the light most favorable to O'Handley, the OEC did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content-moderation policy and using its own independent judgment.[2]

A similar logic exists in our First Amendment cases. In deciding whether the government may urge a private party

---

[2] When articulating this version of the nexus test in *Blum*, 457 U.S. at 1008, the Supreme Court first suggested that government encouragement will be insufficient for state action purposes if the private party later makes the challenged decision based on its own independent judgment. Although we have since clarified that a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government, *see Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 748–55 (9th Cir. 2020), for reasons described below we also do not see the high degree of entwinement needed for state action in this case.

to remove (or refrain from engaging in) protected speech, we have drawn a sharp distinction between attempts to convince and attempts to coerce. Particularly relevant here, we have held that government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply. *See American Family Association v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002); *accord Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003). This distinction tracks core First Amendment principles. A private party can find the government's stated reasons for making a request persuasive, just as it can be moved by any other speaker's message. The First Amendment does not interfere with this communication so long as the intermediary is free to disagree with the government and to make its own independent judgment about whether to comply with the government's request. Like the Tenth Circuit, we see no reason to draw the state action line in a different place. *See VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1160–68 (10th Cir. 2021) (applying the First Amendment's dichotomy between coercion and persuasion to determine that the plaintiff had not alleged a sufficient nexus for state action).

In this case, O'Handley has not satisfied the nexus test because he has not alleged facts plausibly suggesting that the OEC pressured Twitter into taking any action against him. Even if we accept O'Handley's allegation that the OEC's message was a specific request that Twitter remove his November 12th post, Twitter's compliance with that request was purely optional. With no intimation that Twitter would suffer adverse consequences if it refused the request (or receive benefits if it complied), any decision that Twitter

took in response was the result of its own independent judgment in enforcing its Civic Integrity Policy. As was true under the first step of the *Lugar* framework, the fact that Twitter complied with the vast majority of the OEC's removal requests is immaterial. Twitter was free to agree with the OEC's suggestions—or not. And just as Twitter could pay greater attention to what a trusted civil society group had to say, it was equally free to prioritize communications from state officials in its review process without being transformed into a state actor.

*Joint Action Test.* A plaintiff can show joint action either "by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (citation and internal quotation marks omitted). O'Handley has not alleged facts satisfying the joint action test under either approach.[3]

The conspiracy approach to joint action requires the plaintiff to show a "meeting of the minds" between the government and the private party to "violate constitutional rights." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). O'Handley's allegations establish, at most, a meeting of the minds to promptly address election misinformation, not a

---

[3] We have held that joint action also "exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013). This approach to joint action subsumes the nexus test under its banner. *Id.* at 995 n.13. Although combining the two tests makes some sense given that they often bleed together, *see Lugar*, 457 U.S. at 937, we analyze them separately here. But to the extent *Ohno* provides an alternative path to establishing joint action, our nexus test analysis applies with equal force.

meeting of the minds to violate constitutional rights. There is nothing wrongful about Twitter's desire to uphold the integrity of civic discourse on its platform. Nor is there anything illicit in seeking support from outside actors, including government officials, to achieve this goal. A constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals. As explained above, however, O'Handley has not plausibly alleged that Twitter removed his posts to advance the OEC's purported censorship goals as opposed to Twitter's own mission of not allowing users to leverage its platform to mislead voters.

As to the "willful participant" approach, O'Handley contends that Twitter willfully participated in the OEC's efforts to censor political speech online. He points to former Secretary of State Padilla's description of the OEC's "partnership with social media platforms" and to Twitter's creation of the Partner Support Portal to facilitate input from "select government and civil society partners." O'Handley argues that those allegations of a partnership are sufficient to survive a motion to dismiss. We disagree.

For purposes of the state action doctrine, "joint action exists when the state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Tsao*, 698 F.3d at 1140 (citation and internal quotation marks omitted). In other words, joint action is present when the State "significantly involves itself in the private parties' actions and decisionmaking" in a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. This test is intentionally demanding and requires a high degree of cooperation between private parties and state

officials to rise to the level of state action.  *See Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002).

As the Supreme Court has noted, "examples may be the best teachers" of what is necessary to meet this demanding standard given the variety of relevant facts that may lead to an attribution of state action.  *Brentwood Academy*, 531 U.S. at 296.  In *Tsao*, there was sufficient joint action when the Las Vegas police trained private casino security guards and authorized them to issue citations with the force of law.  698 F.3d at 1140.  In *Rawson*, we held that joint action was shown when medical professionals who leased property connected to the State's psychiatric hospital involuntarily confined the plaintiff after his arrest, in part based on the prosecutor's "heav[y] involve[ment] in the decisionmaking process."  975 F.3d at 754.

The allegations in O'Handley's complaint do not give rise to a plausible inference of a similar degree of entwinement between Twitter's actions and those of state officials.  The only alleged interactions are communications between the OEC and Twitter in which the OEC flagged for Twitter's review posts that potentially violated the company's content-moderation policy.  The fact that the OEC engaged in these communications on a repeated basis through the Partner Support Portal does not alter the equation, especially because O'Handley alleges only one such communication regarding him.  The Portal offered a priority pathway for the OEC to supply Twitter with information, but in every case the company's employees decided how to utilize this information based on their own reading of the flagged posts and their own understanding of the Twitter Rules.

The relationship between Twitter and the OEC more closely resembles the "consultation and information sharing" that we held did not rise to the level of joint action in *Mathis*, 75 F.3d at 504. In that case, PG&E decided to exclude one of its employees from its plant after conducting an undercover investigation in collaboration with a government narcotics task force. *Id.* at 501. The suspended employee then sued PG&E for violating his constitutional rights under a joint action theory. *Id.* We rejected his claim because, even though the task force engaged in consultation and information sharing during the investigation, the task force "wasn't involved in the decision to exclude Mathis from the plant," and the plaintiff "brought no evidence PG&E relied on direct or indirect support of state officials in making and carrying out its decision to exclude him." *Id.* at 504.

The same is true here. The OEC reported to Twitter that it believed certain posts spread election misinformation, and Twitter then decided whether to take disciplinary action under the terms of its Civic Integrity Policy. O'Handley alleges no facts plausibly suggesting either that the OEC interjected itself into the company's internal decisions to limit access to his tweets and suspend his account or that the State played any role in drafting Twitter's Civic Integrity Policy. As in *Mathis*, this was an arm's-length relationship, and Twitter never took its hands off the wheel.

In sum, we conclude that Twitter's content-moderation decisions did not constitute state action because (1) Twitter did not exercise a state-conferred right or enforce a state-imposed rule under the first step of the *Lugar* framework, and (2) the interactions between Twitter and the OEC do not satisfy either the nexus or the joint action tests under the second step. Our resolution of this issue is determinative

with respect to O'Handley's claims under 42 U.S.C. § 1983 because each of those claims requires proof of state action. *See Lugar*, 457 U.S. at 928.  His claim under 42 U.S.C. § 1985 also fails because the test for proving a conspiracy between a private party and the government to deprive an individual of constitutional rights under § 1985 tracks the inquiry under the conspiracy formulation of the joint action test.  *See Caldeira v. County of Kauai*, 866 F.2d 1175, 1181 (9th Cir. 1989).[4]

### III

The district court dismissed the federal claims against Secretary of State Weber based on a lack of Article III standing, the absence of state action, and the failure to state a viable claim for relief.  We conclude that O'Handley has standing to seek injunctive relief against Secretary Weber and that, even though the Secretary was not responsible for Twitter's content-moderation decisions, state action exists insofar as officials in her office flagged O'Handley's November 12, 2020, post.  Limiting our review to those actions, we nevertheless affirm the district court's dismissal of O'Handley's federal claims under Federal Rule of Civil Procedure 12(b)(6).

### A

To establish Article III standing to sue, a plaintiff must demonstrate that he "(1) suffered an injury in fact, (2) that is

---

[4] Because we hold that O'Handley did not plausibly allege a meeting of the minds to violate any constitutional right, we need not decide whether § 1985 applies in this context.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (noting that § 1985 claims must involve "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" (citation omitted)).

fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It is clear that O'Handley suffered a concrete injury when Twitter limited other users' ability to access his posts and then later suspended his account. It is less obvious whether those injuries are traceable to the Secretary of State's conduct and whether a court can provide effective injunctive relief.

As to traceability, the injuries that O'Handley alleges in his complaint—his inability to communicate with his followers and pursue his chosen profession as a social media influencer—resulted from Twitter's decision to suspend his account in February 2021. That decision is several steps removed from the OEC's flagging of his November 12th post three months earlier. In the interim, Twitter had increased its enforcement efforts, implemented a new five-strike protocol, and assessed four additional strikes against O'Handley's account based on other posts that O'Handley does not allege the OEC had any role in flagging.

Despite the distance between Secretary Weber's actions and O'Handley's alleged injuries, two overriding factors weigh in favor of concluding that his injuries are fairly traceable to the Secretary's actions. First, the traceability requirement is less demanding than proximate causation, and thus the "causation chain does not fail solely because there are several links" or because a single third party's actions intervened. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citation and internal quotation marks omitted); *see also Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). It is possible to draw a causal line from the OEC's flagging of the November 12th post to O'Handley's suspension from the

platform, even if it is one with several twists and turns. Drawing that line is even easier when we credit, as we must, O'Handley's allegation that Twitter had never imposed any disciplinary action against him until the OEC placed his account on the company's radar. Second, O'Handley now seeks to broaden the conception of his injuries to include the limitations that Twitter placed on other users' ability to access his November 12th post. Those limitations also represent a concrete injury fairly traceable to the OEC's actions.

As to redressability, O'Handley sued Secretary Weber in her official capacity seeking a permanent injunction stating that "the Secretary of State and the OEC may not censor speech." Until recently, it was doubtful whether this relief would remedy O'Handley's alleged injuries because Twitter had permanently suspended his account, and the requested injunction would not change that fact. Those doubts disappeared in December 2022 when Twitter restored his account. *See* @DC_Draino, Twitter (Dec. 16, 2022, 10:35 AM), https://twitter.com/DC_Draino/status/1603821014730801161?cxt=HHwWkoCwpeWt9cEsAAAA. With the redressability issue now resolved in O'Handley's favor, we conclude that he has standing to seek injunctive relief against Secretary Weber.

### B

We turn next to the state action issue. In accord with our analysis above, we agree with the district court that Secretary Weber is not responsible for any of Twitter's content-moderation decisions with respect to O'Handley. This fact precludes O'Handley from bringing his claim against Secretary Weber under the Due Process Clause for the

deprivation of his property or liberty interests as a social media influencer because that grievance arises solely out of Twitter's decisions to limit access to his posts and to suspend his account.[5]   By contrast, our state action analysis does not preclude O'Handley from challenging the Secretary's own conduct in directing the OEC because those acts are, by definition, acts of the State.   Thus, the state action requirement does not bar O'Handley from proceeding against the Secretary on his remaining four federal claims: the conspiracy claim under 42 U.S.C. § 1985, the First Amendment claim, the Equal Protection Clause claim, and his void-for-vagueness challenge to California Elections Code § 10.5.[6]

C

Turning to the merits, we affirm the district court's dismissal of O'Handley's claims against Secretary Weber under Rule 12(b)(6) because he has failed to state a claim on which relief can be granted.

*Conspiracy*.   The conspiracy claim against Secretary Weber under 42 U.S.C. § 1985 has the same fatal flaw as the analogous claim against Twitter.   As explained above, O'Handley has not alleged that Twitter and Secretary Weber shared a goal of violating his or anyone else's constitutional

---

[5] To the extent O'Handley claims that Secretary Weber interfered with his liberty interest in free speech, that claim overlaps entirely with his First Amendment challenge and fails for the reasons stated below.

[6] Although the complaint also alleges that Secretary Weber violated the California Constitution's Liberty of Speech Clause, O'Handley now concedes that he cannot sue the Secretary in her official capacity in federal court for violating state law.   *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984).

rights.  There is no unconstitutional conspiracy without this shared specific intent.  *See Caldeira*, 866 F.2d at 1181.

*First Amendment*.  O'Handley asserts two theories supporting his First Amendment claim against Secretary Weber, one alleging that the OEC abridged his freedom of speech when the agency pressured Twitter to remove disfavored content, and the other alleging that the OEC engaged in impermissible retaliation against his protected political expression.  O'Handley's allegations fail to state a viable First Amendment claim under either theory.

The first theory rests on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), which held that a State may not compel an intermediary to censor disfavored speech.  *Id.* at 68–72.  *Bantam Books* and its progeny draw a line between coercion and persuasion:  The former is unconstitutional intimidation while the latter is permissible government speech.  *See American Family Association*, 277 F.3d at 1125.  This line holds even when government officials ask an intermediary not to carry content they find disagreeable.  *See id.*  Here, as discussed above, the complaint's allegations do not plausibly support an inference that the OEC coerced Twitter into taking action against O'Handley.  The OEC communicated with Twitter through the Partner Support Portal, which Twitter voluntarily created because it valued outside actors' input.  Twitter then decided how to respond to those actors' recommendations independently, in conformity with the terms of its own content-moderation policy.

O'Handley argues that intimidation is implicit when an agency with regulatory authority requests that a private party take a particular action.  This argument is flawed because the OEC's mandate gives it no enforcement power over Twitter.

*See* Cal. Elec. Code § 10.5.   Regardless, the existence or absence of direct regulatory authority is "not necessarily dispositive." *Okwedy*, 333 F.3d at 344.   Agencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation. *See, e.g.*, *National Rifle Association of America v. Vullo*, 49 F.4th 700, 714–19 (2d Cir. 2022).

The retaliation-based theory of liability fails as well.  To state a retaliation claim, a plaintiff must show that: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel School District*, 608 F.3d 540, 543 (9th Cir. 2010) (footnote omitted).

O'Handley's claim falters on the second prong because he has not alleged that the OEC took any adverse action against him.   "The most familiar adverse actions are exercise[s] of governmental power that are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech." *Id.* at 544 (citation and internal quotation marks omitted).  Flagging a post that potentially violates a private company's content-moderation policy does not fit this mold.  Rather, it is a form of government speech that we have refused to construe as "adverse action" because doing so would prevent government officials from exercising their own First Amendment rights. *See Mulligan v. Nichols*, 835 F.3d 983, 988–89 (9th Cir. 2016).  California has a strong interest in expressing its views on the integrity of its electoral process. The fact that the State chose to counteract what it saw as

misinformation about the 2020 election by sharing its views directly with Twitter rather than by speaking out in public does not dilute its speech rights or transform permissible government speech into problematic adverse action. *See Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).

*Equal Protection*. O'Handley alleges that Secretary Weber violated the Fourteenth Amendment's Equal Protection Clause because the OEC targeted conservative commentators for special treatment and did not equally scrutinize liberal critics of the electoral process. Uneven enforcement can pose an equal protection issue, *see United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995), but O'Handley has not alleged facts plausibly supporting his speculation of political bias. He does not name any other conservative commentators whose speech the OEC allegedly targeted or identify any "self-identified political liberals" whose false or misleading tweets the OEC allegedly declined to flag. A cursory assertion of differential treatment unsupported by factual allegations is insufficient to state a claim for relief. *See Lindsay v. Bowen*, 750 F.3d 1061, 1064–65 (9th Cir. 2014).

*Vagueness*. Finally, O'Handley alleges that California Elections Code § 10.5 is void for vagueness because the statute requires the OEC to "monitor and counteract false or misleading information regarding the electoral process" without providing a sufficiently concrete definition of what the phrase "false or misleading information" means in this context. Cal. Elec. Code § 10.5(b)(2). A statute is facially vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously

discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Section 10.5 does not attempt to prohibit anything (and hence raises no fair notice concerns), and it vests no government official with enforcement authority that could be discriminatorily applied. It is merely a statement of the OEC's general mission. Similar to many unenforceable government pronouncements, it is "not amenable to a vagueness challenge." *Beckles v. United States*, 580 U.S. 256, 265 (2017). O'Handley's as-applied challenge also fails because Elections Code § 10.5 was never applied against him. Twitter instead enforced its own Civic Integrity Policy, as it made clear in all of its communications with O'Handley.

\*      \*      \*

We affirm the district court's dismissal of all federal claims against Twitter because the company was neither a state actor nor a co-conspirator with state officials acting with the shared goal of violating constitutional rights. We affirm the dismissal of all federal claims against Secretary of State Weber because her office did not engage in any unconstitutional acts. Having properly dismissed O'Handley's federal claims with prejudice, the district court did not abuse its discretion when it declined to exercise supplemental jurisdiction over his remaining claim under the California Constitution. *See Lima v. United States Department of Education*, 947 F.3d 1122, 1128 (9th Cir. 2020).

**AFFIRMED.**